# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| DODSON AVIATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-4102-KGS |
| | ) | |
| HLMP AVIATION CORP., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court upon the parties' cross motions for partial summary judgment. The motions are fully briefed, and the Court is prepared to rule. For the reasons explained below, Defendant's Motion for Partial Summary Judgment (ECF No. 131) is granted in part and denied in part, and Plaintiff's Motion for Partial Summary Judgment (ECF No. 127) is granted.

## I.    Introduction and Background

Prior to February 2007, PTC Aviation Corporation ("PTC") owned a Beech King Air Model 200 Aircraft ("King Air").[1] At all times relevant, Hernan Lopez ("Lopez") was the sole owner of PTC.[2] In July 2006, Lopez purportedly contracted with Dodson Aviation, Inc. ("Plaintiff" or "Dodson Aviation") to perform certain repairs on the King Air.[3] Thereafter, in July 2006, Lopez ultimately delivered the King Air to Mena Aerospace, Inc. ("Mena"), which was to perform the

---

[1] Agreement between Hernan Lopez, Orlando Padron, PTC, and HLMP Aviation Corp. ("Lopez– Padron Agreement), ECF No. 132-4.

[2] *Id.*; Lopez Dep. 5:25–6:5, June 11, 2008, ECF No. 128-13.

[3] As will be discussed later, the parties dispute whether Lopez had a contract with only Dodson Aviation or whether he also entered into separate contracts with Dodson International Parts, Inc. and Mena Aerospace, Inc. for certain portions of the repairs.

initial portion of the repairs. Lopez and Dodson Aviation did not enter into a written contract governing the repairs to be performed.

On February 9, 2007, Lopez, PTC, Orlando Padron ("Padron"), and HLMP Aviation Corp. ("HLMP" or "Defendant") entered into an agreement regarding ownership of the King Air.[4] As contemplated by the agreement, a new corporation (HLMP) was formed whose shares were owned equally by Lopez and Padron.[5] The agreement states that Lopez and Padron wished to transfer title of the King Air to HLMP.[6] Under a section entitled "Consideration," the agreement states Padron was loaning $55,000 to Lopez and describes the parties' contributions towards refurbishment of the King Air as follows: Lopez would "provide the expertise and skill reasonably necessary to refurbish the [King Air] rendering it airworthy," and Padron would "provide the funds reasonably necessary to accomplish such work which has been presented by [Lopez] to be $250,000."[7] On February 9, 2007, Padron was elected President and Secretary of HLMP; Lopez was elected Vice President and Treasurer.[8] Also on February 9, 2007, Lopez executed a bill of sale on behalf of PTC, transferring title of the King Air to HLMP.[9]

After February 9, 2007, Lopez continued to communicate with Dodson Aviation about the

---

[4] Lopez–Padron Agreement, ECF No. 132-4.

[5] *Id.*

[6] *Id.*

[7] *Id.* § 2(b)(ii).

[8] Padron Decl., Ex. 2, ECF No. 132-3.

[9] Bill of Sale, ECF No. 132-12. During his deposition, Lopez testified he understood the bill of sale was to be held as collateral until Padron's loan was repaid. Lopez Dep. 12:19–13:15; 15:9–23; 65:23–66:1, June 11, 2008, ECF No. 139-5.

repairs to the King Air.[10] On February 8, 2008, when the work on the King Air was complete or nearly complete, Lopez was sent a "recap" of the charges for repairing the King Air, which reflected a balance due of $315,957.18.[11]

On March 18, 2008, HLMP and Padron initiated a lawsuit in Miami-Dade County, Florida, against Lopez, PTC, Dodson Aviation, Dodson International Parts, Inc. ("DIPI"), and 1st Source Bank, alleging *inter alia* that Lopez conspired to defraud Padron into organizing and investing capital in HLMP.[12] More specifically, HLMP and Padron alleged Lopez misrepresented the cost to repair the King Air and failed to disclose the existence of a $225,000 lien on the King Air held by 1st Source Bank.[13] On March 19, 2008, HLMP and/or Padron removed the King Air from Dodson Aviation's possession pursuant to an Ex Parte Temporary Injunction issued by the Circuit Court of Miami-Dade County, Florida.[14]

On March 19, 2008, Dodson Aviation filed a mechanic's lien pursuant to K.S.A. 58-201 and a Second Amended Lien in May 2008 for the services and parts used in repairing the King Air.[15] Dodson Aviation claims the value of the services provided for repairing the King Air, plus out-of-pocket expenses, is nearly $616,000; after giving credit for $131,102.46 in advance payments,

---

[10] Verified Pet. to Foreclose Mechanic's Lien, ECF No. 1-1.

[11] E-mail from Mary Snyder to Hernan Lopez (Feb. 8, 2008), ECF No. 132-16.

[12] Verified Fl. Compl., ECF No. 132-38.

[13] *Id.* ¶ 29.

[14] Ex Parte Temporary Inj., ECF No. 133-6.

[15] Verified Pet. to Foreclose Mechanic's Lien ¶ 15, ECF No. 1-1; Second Am. Statement for Mechanic's Lien, ECF No. 1-2.

Dodson Aviation still claims $484,894.50.[16] This amount includes services performed and costs incurred by DIPI and Mena, two alleged subcontractors of Dodson Aviation. Dodson Aviation then filed this action to foreclose its mechanic's lien.[17] HLMP disputes the amount due to Dodson Aviation, but not the validity of the lien.[18]

HLMP has filed a Motion for Partial Summary Judgment, seeking an order that Dodson Aviation is not entitled to prejudgment interest as a matter of Kansas law. HLMP also seeks an order that Dodson Aviation's lien does not extend to work performed on the King Air by Mena or for parts sold by DIPI because they purportedly had separate, direct contracts with Lopez. Further, HLMP asserts it is entitled to an offset of up to $225,000 for any amounts otherwise due Dodson Aviation because Dodson Aviation was purportedly unjustly enriched by HLMP's payment of $225,000 to remove a lien held by 1st Source Bank on the King Air. Dodson Aviation has filed a cross Motion for Partial Summary Judgment seeking an order that HLMP is not entitled to an offset for unjust enrichment.

## II.    Legal Standard Governing Summary Judgment Motions

Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[19] As to materiality, the substantive law will identify which facts are material.[20] Only disputes over facts

---

[16] Compilation of Charges, ECF No. 132-19; Second Am. Statement for Mechanic's Lien, ECF No. 1-2; Pretrial Order, ECF No. 125.

[17] Verified Pet. to Foreclose Mechanic's Lien, ECF No. 1-1.

[18] Answer of Def. HLMP Aviation Corp. ¶ 15, ECF No. 5.

[19] Fed. R. Civ. P. 56(a).

[20] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes that are irrelevant or unnecessary will not be counted.[21]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[22]  A "genuine" issue of fact exists where "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[23]  In considering a motion for summary judgment, a court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."[24]

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[25]  In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[26]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[27]  A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of its

---

[21] *Id.*

[22] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson,* 477 U.S. at 248).

[23] *Id.*

[24] *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).

[25] *Adler*, 144 F.3d at 670–71.

[26] *Id.* at 671 (citing *Celetox Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

[27] *Anderson*, 477 U.S. at 256.

pleading.[28]   Rather, the nonmoving part must "set forth specific facts that would be admissible in

evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[29]   To

accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or

specific exhibits incorporated therein.[30]   The court's function at this juncture is not to weigh the

evidence, but merely to determine whether there is sufficient evidence favoring the nonmovant for

a finder of fact to return a verdict in that party's favor.[31]

## III.   Analysis

### A.   Prejudgment Interest

Dodson Aviation claims prejudgment interest in the amount of $105,000 through May 18,

2010, with interest continuing to accrue at a per diem rate of $135.00 pursuant to K.S.A. 16-201.[32]

K.S.A. 16-201 provides, "Creditors shall be allowed to receive interest at the rate of ten percent per

annum, when no other rate of interest is agreed upon, for any money after it becomes due . . ."

Under this statute, a party is *entitled* to prejudgment interest only on liquidated claims.[33]   A claim

becomes liquidated when both the amount due and the date on which it is due are fixed and certain,

---

[28] *Id.*

[29] *Adler*, 144 F.3d at 671.

[30] *Id.*

[31] *BRB Contractors, Inc. v. Akkerman Equip., Inc.*, 935 F. Supp. 1156, 1159 (D. Kan. 1996).

[32] Pretrial Order 9 ¶ 10, ECF No. 125.   State law governs an award of prejudgment interest on state law claims.  *Koch v. Koch Indus., Inc.*, 996 F. Supp. 1273, 1280 (D. Kan. 1998).

[33] *Royal Coll. Shop, Inc. v. N. Ins. Co. of N.Y.*, 895 F.2d 670, 673–674 (10th Cir. 1990); *Integrated Living Communities, Inc. v. Homestead Co.*, 106 F. Supp. 2d 1141, 1144 (D. Kan. 2000).

or when the same become definitely ascertainable by mathematical computation.[34] As a general rule, prejudgment interest is not allowable on a claim for unliquidated damages, subject to certain exceptions.[35]

In this case, there was no written contract governing the repair of the King Air. On July 9, 2006, Lopez requested a quote from Robert Dodson, Jr. ("JR Dodson") for work on the King Air.[36] Lopez ended up speaking with Robert Dodson, Sr., Dodson Aviation's President, who provided an estimate of $250,000 prior to seeing the King Air.[37] According to Dodson Aviation's representative, the initial $250,000 estimate including repainting the King Air, refurbishing its interior, performing an "import inspection," and upgrading some radios.[38] During his deposition, Lopez testified he was given a $250,000 quote but then qualified that the $250,000 quote was only for parts, with another $150,000 quoted for labor.[39] Thus, it does not appear that Lopez and Dodson Aviation even agree on the scope of the initial quote. After the King Air was delivered for repair, Lopez was told the scope of the work needed to be expanded due to other problems found on the plane but was not provided with an estimate for the additional work.[40]

Lopez testified he was quoted labor rates ranging from $38 per hour to $56 per hour, but he

---

[34] *In re Midland Indus., Inc.*, 703 P.2d 840, 842 (Kan. 1985).

[35] *Schatz Distrib. Co. v. Olivetti Corp. of Am.*, 647 P.2d 820, 826 (Kan. Ct. App. 1982).

[36] Letter from Lopez to JR Dodson (July 9, 2006), ECF No. 132-14.

[37] Dodson Aviation R. 30(b)(6) Dep. 84:14–85:7, ECF No. 132-6.

[38] *Id.* 86:1–6.

[39] Lopez Dep. 29:20–30:18, ECF No. 132-5.

[40] *Id.* 71:13–72:21.

could not remember the exact amounts.[41]  Robert Dodson, Sr. testified he never discussed hourly labor rates with Lopez.[42]  According to Robert Dodson, Sr., there was never an agreement the work would be performed for a fixed price or at any particular hourly rates.[43]  The agreement was simply, "we're going to do the work, you'll get billed for it."[44]  Lopez and Dodson Aviation do not appear to have agreed upon any specific financial terms of the work to be performed.  Thus, there was no contract or agreement specifying how the cost of the repairs would be calculated.[45]

The absence of a such a contract does not necessarily preclude a finding that Dodson Aviation's damages are liquidated as long as the damages are still certain or fixed or can be ascertained by mathematical computation.[46]  Dodson Aviation attached to its Second Amended Statement for Mechanic's Lien an invoice listing the charges for its labor, parts, and out-of-pocket expenses, claiming work on the plane was worth nearly $616,000.[47]  Dodson Aviation argues this

---

[41] *Id.* 75:7–77:14.

[42] Robert Dodson, Sr. Dep. 25:11–18, ECF No. 132-2.

[43] *Id.* 27:10–28:23.

[44] *Id.*

[45] *Cf. Bline Contracting Co., Inc. v. Bobby Goins Enters., Inc.*, 715 F. Supp. 1044, 1048 (D. Kan. 1989) (awarding prejudgment interest because the damages were based upon the contract price of the goods and not subject to any dispute between the parties); *see also Miller v. Botwin*, 899 P.2d 1004, 1012 (Kan. 1995) (holding that fees under a contract are liquidated if a contract is clear as to the method of fee calculation and as to the date the fees are due).

[46] *See Owen Lumber Co. v. Chartrand*, 157 P.3d 1109, 1111–12, 1118 (Kan. 2007) (awarding prejudgment interest to plaintiff, a subcontractor, on a mechanic's lien for lumber and materials supplied to a contractor for use in the construction of a new home even though there was no written contract governing the sale).

[47] Second Am. Statement for Mechanic's Lien, ECF No. 1-2.  After giving credit for $131,000 in progress payments, Dodson Aviation claims it is owed $484,894.50.  Pretrial Order, ECF No. 125.

is a fixed and ascertainable amount, which entitles it to prejudgment interest. HLMP contends Dodson Aviation's claim is not liquidated because it disputes the amounts reflected on the invoice attached to the lien.

In support of its claim for prejudgment interest, Dodson Aviation relies upon *Owen Lumber Co. v. Chartrand*. In that case, plaintiff, a subcontractor, was awarded prejudgment interest on a mechanic's lien for lumber and other materials supplied to a contractor for use in the construction of a new home even though there was no written contract governing the sale of the materials.[48] Instead, the subcontractor supplied the requested materials and then billed the contractor on a monthly basis.[49] The homeowners disputed the amount due because they contended the invoices attached to the lien statement did not add up to the amount claimed in the lien and that the amount of the lien was more than the amount agreed upon between the contractor and subcontractor.[50]

In *Owen Lumber Co.*, the homeowners conceded the amount owed could be mathematically calculated by adding the subcontractor's invoices and subtracting any payments.[51] There was no dispute as the value of the materials provided by the subcontractor or the amount due when the lien was filed.[52] As a result, the Kansas Supreme Court characterized the issue as a good faith controversy involving the liability of the homeowners on the claim, which does not preclude the

---

[48] *Owen Lumber Co.*, 157 P.3d at 1111–12, 1118.

[49] *Id*. at 1118.

[50] *Id*. at 1118–19.

[51] *Id.* at 1119.

[52] *Id.*

granting of prejudgment interest.[53]

As reflected in *Owen Lumber Co.*, it is not determinative that liability for a claim is disputed as long as the amount of damages is certain.[54]  For example, in *Crawford v. Prudential Insurance Co. of America*, plaintiff sued his insurance carrier seeking to recover medical expenses purportedly covered by a group health and accident insurance policy.[55]  Defendant denied it was liable for any payments, relying on an employment injury exclusion in the policy.[56]  The trial court held in the insured's favor and also awarded prejudgment interest.[57]  The Kansas Supreme Court upheld the award of prejudgment interest because, although there was good faith controversy as to the existence of insurance coverage, there was never any serious dispute as to the amount of damages claimed by plaintiff.[58]

In *Royal College Shop, Inc. v. Northern Insurance Company of New York*, plaintiffs sued their insurance carrier after it refused to pay on a claim arising from a fire at plaintiffs' business.[59]  The fire destroyed personal property, store inventory, and a substantial portion of a building in which one of the plaintiffs had a partial ownership interest.[60]  After defendant refused to pay on plaintiffs' claim, plaintiffs filed suit seeking to recover for loss of inventory, earnings, personal

---

[53] *Id.*

[54] *See also Ireland v. Dodson*, 704 F. Supp. 2d 1128, 1147 (D. Kan. 2010).

[55] *Crawford v. Prudential Ins. Co. of Am.*, 783 P.2d 900, 901–02 (Kan. 1989).

[56] *Id.*

[57] *Id.* at 902.

[58] *Id.*

[59] *Royal Coll. Shop, Inc. v. N. Ins. Co. of New York*, 895 F.2d 670, 672 (10th Cir. 1990).

[60] *Id.*

property and damage to the ownership interest in the building.[61]  The parties stipulated to the amount of damages for these latter two categories prior to trial.[62]  After the jury returned a favorable verdict, plaintiffs moved for prejudgment interest, which was denied.[63]

The Tenth Circuit reversed the district court's ruling in part, holding that plaintiffs were entitled to prejudgment interest on the claims for which the damages were stipulated to by the parties prior to trial.[64]  The Tenth Circuit held that the damages for those claims were ascertainable because they were not disputed.[65]

However, the Tenth Circuit affirmed the district court's denial of prejudgment interest on the damages claimed for loss to inventory and loss of earnings because these amounts were "hotly contested" at trial and thus, were not fixed or certain.[66]  As reflected in *Royal College Shop, Inc.,* courts in Kansas distinguish between disputes concerning the underlying liability for the claim and disputes concerning the amount of the claim.  Where the *amount* of the claim is disputed as a question distinct from *liability* for the claim, claims are unliquidated.

---

[61] *Id.* at 672–73.

[62] *Id.* at 673.

[63] *Id.*

[64] *Id.* at 674.

[65] *Id*; *see also J. Walters Constr. Co. v. Greystone S. P'Ship, L.P.*, 817 P.2d 201, 209 (Kan. Ct. App. 1991) (awarding prejudgment interest for amount of mechanic's lien because there was no dispute that at least the amount on the lien statement was due when it was filed); *Hysten v. Burlington N. Santa Fe Ry. Co.*, 530 F.3d 1260, 1281 (10th Cir. 2008) (affirming district court's decision to award prejudgment interest under Kansas law because there was no evidence that defendant disputed the amount of damages sought by plaintiff as a question distinct from the issue of liability).

[66] *Royal Coll. Shop, Inc.*, 895 F.2d at 675.

For example, in *Equity Investors, Inc. v. Academy Insurance Group, Inc.*, the Kansas Supreme Court held that a claim was unliquidated because the parties disputed the value of plaintiff's damages.[67] In that case, plaintiff had agreed to transfer all of its assets and liabilities to defendant in exchange for 501,200 shares of defendant's stock.[68] After finding that defendant had breached the agreement, the trial court had to determine the value of the 501,200 shares of defendant's stock to assess plaintiff's damages.[69] The parties disputed how to determine the market value of the stock.[70] The Kansas Supreme Court held the damages were unliquidated because the value of the stock was the "primary subject of dispute."[71]

In *Southern Painting Company of Tennessee, Inc. v. United States*, a subcontractor brought a claim against a general contractor under quantum meruit for the reasonable value of the subcontractor's services.[72] The Tenth Circuit concluded that an award of prejudgment interest was not permissible under Kansas law because "[t]he evidence as to the value of [the subcontractor's] services was in sharp conflict."[73] Similarly, in *Green Construction Co. v. Kansas Power & Light Co.*, the Tenth Circuit affirmed the district court's denial of prejudgment interest because the amount

---

[67] *Equity Investors, Inc. v. Acad. Ins. Grp., Inc.*, 625 P.2d 466, 469 (Kan. 1981).

[68] *Id.* at 467.

[69] *Id.*

[70] *Id.* at 469.

[71] *Id.*

[72] *S. Painting Co. of Tenn., Inc. v. United States*, 222 F.2d 431, 432 (10th Cir. 1955).

[73] *Id.* at 436; *see also Hutton Contracting Co. v. City of Coffeyville*, 487 F.3d 772, 786 (10th Cir. 2007) (affirming district court's denial of prejudgment interest because the amount of damages, not just the liability for that amount, was subject to dispute).

of damages was disputed throughout trial and required a jury determination.[74] The Tenth Circuit summarized, "[t]his is not a case where the parties stipulated to the damages or even generally agreed on the damages."[75]

This case is distinguishable from *Owen Lumber Co.* because HLMP disputes the amount of Dodson Aviation's damages as a question distinct from its liability for the damages. In support of its motion, HLMP has presented evidence in the form of an expert report disputing the reasonable value of the services and materials claimed by Dodson Aviation in its lien.[76] For example, HLMP's expert opines that HLMP was overcharged for various used parts and disputes the "man hours" spent on various repairs.[77] HLMP's expert believes Dodson Aviation's work on the plane was worth no more than $342,225.47 before any deductions for progress payments, breaches of warranty, or offset for the payment made to 1st Source Bank.[78] In addition, it appears that the fact finder will need to make a finding as to the reasonable hourly rate for the repairs.

Similar to *Southern Painting Company of Tennessee, Inc.* and *Green Construction Co.*, HLMP has submitted evidence disputing the amount of Dodson Aviation's damages; as a result, the

---

[74] *Green Constr. Co. v. Kan. Power & Light Co.*, 1 F.3d 1005, 1010 (10th Cir. 1993).

[75] *Id.*; *see also Hatch & Kirk Power Servs. Corp. v. City of Girard*, No. 95-1155-DES, 1999 WL 99307, at *2 (D. Kan. Jan. 19, 1999) (denying prejudgment interest because the damage award was "hotly contested" and the amount could not have been determined until the jury had returned its verdict and placed a value on what had and had not been completed under the contract); *Whittenburg v. L.J. Holding Co.*, 838 F. Supp. 519 (D. Kan. 1993) (plaintiffs were not entitled to prejudgment interest under K.S.A. 16-201 because the amount of damages was the primary issue in dispute).

[76] Report of Frank R. Evanega, ECF No. 132-20.

[77] *Id.* at 6–7.

[78] Spreadsheet of Reasonable Costs for Work Performed, ECF No. 132-21.

amount of Dodson Aviation's damages cannot be determined until trial.[79] The dispute over the value of the services performed and materials provided precludes a mandatory award of prejudgment interest pursuant to K.S.A. 16-201. Although HLMP also seeks certain offsets,[80] this is not the basis for HLMP's argument that Dodson Aviation's damages are uncertain.[81] Accordingly, the Court finds that Dodson Aviation's damages are unliquidated.

Further, under the mechanic's lien statute at issue, Dodson Aviation must prove the "reasonable value" of services it performed and materials used in repairing the King Air.[82] This appears to be similar to a claim for quantum meruit in which a party seeks to recover for the reasonable value of services performed. Kansas law limits the ability to award prejudgment interest on claims for quantum meruit.[83]

---

[79] As reflected in the Pretrial Order, the reasonable value of Dodson Aviation's services and materials is a question of fact to be resolved at trial. Pretrial Order ¶ 8, ECF No. 125. Although the Court has not found any Kansas case law directly on point, courts in other jurisdictions have held that the actual amount due on a mechanic's lien is a question of fact. *See, e.g.*, *Basic Modular Facilities, Inc. v. Ehsanipour*, 83 Cal. Rptr. 2d 462, 465 (Cal. Ct. App. 1999).

[80] HLMP contends any amounts due Dodson Aviation must be offset by $29,917.59 for Dodson Aviation's purported breach of an implied warranty of workmanlike performance; $18,997.00 for the cost of a replacement Terrain Awareness and Warning System removed from the plane; and $225,000.00 for the payment made to 1st Source Bank.

[81] *Cf. Ireland v. Dodson*, 704 F. Supp. 2d 1128, 1147 (D. Kan. 2010) (holding that under Kansas law, liquidated damages do not become unliquidated, thus barring prejudgment interest, simply because a counterclaim or setoff reduces the amount of the final award).

[82] K.S.A. 58-201; *see also* Pretrial Order at 2, ECF No. 125.

[83] *See Miller v. Botwin*, 899 P.2d 1004, 1012 (Kan. 1995) (a quantum meruit judgment "does not draw prejudgment interest because the amount due is not liquidated until the trial court's determination of the amount"); *Marcotte Realty & Auction, Inc. v. Schumacher*, 624 P.2d 420, 432 (Kan. 1981) (a judgment based upon quantum meruit does not support prejudgment interest).

Dodson Aviation argues the amount of damages claim has "not been a moving target. It was on its mechanic's lien, it is in the original petition in this matter and it is contained in the Pretrial Order." However, this does not mean the fact finder is obligated to reach the same conclusion as to the value of Dodson Aviation's services.

Dodson Aviation also argues HLMP's motion should be denied because the Court still has discretion to award prejudgment interest on unliquidated claims. In *Lightcap v. Mobil Oil Corp.*, the Kansas Supreme Court created an exception to the general rule that prejudgment interest is not permitted on a claim for unliquidated damages; the Kansas Supreme Court held that when equitable principles so require, a court in its discretion may award prejudgment interest where necessary to arrive at fair and full compensation.[84]

In *Lightcap*, plaintiff was told that defendant would hold certain funds for plaintiff in a segregated account; instead, defendant used the funds for its personal gain by either investing them or using them in its business.[85] The Kansas Supreme Court determined that prejudgment interest was appropriate for the damages arising from this conduct.[86] The opinion emphasized that defendant had "full use and control of this money."[87] As the Kansas Supreme Court later stated, "we held [in *Lightcap*] the district court has the discretion to award prejudgment interest on an unliquidated claim when the defendant has had use of the money, the plaintiff has been deprived of the use of the

---

[84] *Lightcap v. Mobil Oil Corp.*, 562 P.2d 1, 16 (Kan.), *cert. denied*, 434 U.S. 876 (1977).

[85] *Id.* at 15.

[86] *Id.*

[87] *Id.* at 15–16.

money, and the order is necessary to award full compensation."[88]  "Considerations of fairness and traditional equitable principles are to guide the exercise of this discretion."[89]  The holding from *Lightcap* has been interpreted to mean there must be unusual circumstances making it equitable to allow for such an award and that prejudgment interest on an unliquidated claim is ordinarily not appropriate.[90]

Dodson Aviation argues there is "equitable cause enough" for this Court to award prejudgment interest because HLMP has had the full use of the King Air and the fruits of Dodson Aviation's labor.  Dodson Aviation has not explained how this situation differs from any other action to foreclose on a mechanic's lien or why prejudgment interest is necessary for Dodson Aviation to be fully compensated.[91]  As a result, Dodson Aviation has not shown this case involves unusual circumstances such that the Court should deviate from the general rule that prejudgment interest is allowable only on liquidated claims.  Accordingly, the Court holds Dodson Aviation is not entitled to prejudgment interest, and grants HLMP's Motion for Partial Summary Judgment as

---

[88] *Farmers State Bank v. Prod. Credit Ass'n of St. Cloud*, 755 P.2d 518, 528 (Kan. 1988).

[89] *Wichita Fed. Sav. & Loan Ass'n v. Black*, 781 P.2d 707, 721 (Kan. 1989) (superceded on other grounds).

[90] *Fid. & Deposit Co. of Md. v. Hartford Cas. Ins. Co.*, 216 F. Supp. 2d 1240, 1245 (D. Kan. 2002); *see also Kearney v. Kan. Pub. Serv. Co.*, 665 P.2d 757, 769 (Kan. 1983) (holding there were no unusual circumstances justifying prejudgment interest).

[91] *See Fid. & Deposit Co. of Md.*, 216 F. Supp. 2d at 1246 (declining to award prejudgment interest because the litigation involved an ordinary insurance coverage dispute where the parties differed as to amount of damage covered by insurance; there were no unusual circumstances justifying the court to deviate from the general rule that prejudgment interest is not appropriate for unliquidated claims).

to this issue.[92]

B.    Relationship between Dodson Aviation, DIPI, Mena, and Lopez

K.S.A. 58-201 establishes the right of a person who performed work, made repairs or improvements to personal property to obtain a lien for his or her work.  The statutes provides, in relevant part:

> Whenever any person, at or with the owner's request or consent shall perform work, make repairs or improvements or replace, add or install equipment on any goods, personal property, chattels, horses, mules, wagons, buggies, automobiles, trucks, trailers, locomotives, railroad rolling stock, barges, aircraft, equipment of all kinds, including but not limited to construction equipment, vehicles of all kinds, and farm implements of whatsoever kind, a first and prior lien on such personal property is hereby created in favor of such person performing such work, making such repairs or improvements or replacing, adding or installing such equipment and such lien shall amount to the full amount and reasonable value of the services performed and shall include the reasonable value of all material used in the performance of such services and the reasonable value of all equipment replaced, added or installed.

Because mechanics' liens are statutory liens, they can only be acquired in the manner and on the conditions prescribed in the statute.[93]  "Those claiming a mechanic's lien have the burden of bringing themselves clearly within the provisions of the statute."[94] "Lien statutes cannot be extended by implication beyond the clear import of the language employed and their operation cannot be

---

[92] *See Boyd Motors, Inc. v. Emp'rs Ins. Co. of Wausau*, No. 85-2370, 1990 WL 126983, at *3 (D. Kan. July 12, 1990) (granting summary judgment to defendant on issue of prejudgment interest because the circumstances of the case were not extraordinary and did not warrant an equitable award of prejudgment interest).

[93] *Sec. Benefit Life Ins. Co. v. Fleming Cos*., 908 P.2d 1315, 1320 (Kan. Ct. App. 1995) (citing *Mark Twain Kansas City Bank v. Kroh Bros. Dev. Co.*, 798 P.2d 511, 515 (Kan. Ct. App. 1990)).

[94] *Id.* (internal quotations omitted).

enlarged to include activities not specifically embraced."[95]  Although courts give liberal construction to statutory provisions once a mechanic's lien has attached, lien statutes must be strictly construed when deciding whether a lien attaches.[96]

K.S.A. 58-201 allows a lien to be asserted by any person who, "at or with the owner's consent or request" performs work on personal property.  The statute creates a first lien "in favor of such person performing such work."  HLMP contends the implication of this statute is that one who enters into a contract with an owner has a lien only for the work done pursuant to its own contract with the owner, and may not assert the rights of others who have entered into separate contracts with the owner.  Dodson Aviation does not appear to dispute HLMP's interpretation of the statute.[97]  The clear language of K.S.A. 58-201 supports HLMP's interpretation.  HLMP's interpretation also appears consistent with how courts in Kansas have interpreted the statute governing liens on real property.[98]

HLMP contends Lopez entered into three contracts with three separate entities for labor, equipment and parts for the King Air: Dodson Aviation, DIPI, and Mena.  Because Mena and DIPI purportedly had separate contracts with Lopez, HLMP argues the amounts claimed for their work

---

[95] *Id.* (internal quotations omitted).

[96] *Mark Twain Kansas City Bank*, 798 P.2d at 515.

[97] Dodson Aviation devotes significant time in its opposition to arguing it can include in its lien the amounts charged by any subcontractors.  HLMP does not appear to dispute this issue; the issue raised by HLMP is whether certain companies who serviced the King Air were truly subcontractors of Dodson Aviation or whether they had their own separate contracts with Lopez.

[98] *See Unit Sash & Sales Co. v. Early*, 232 P. 232, 232–233 (Kan. 1925) (holding that a lien must be filed for what was furnished under *each separate* contract); *Stewart v. Cunningham*, 548 P.2d 740, 743 (Kan. 1976) ("more than one contractor may be employed by one property owner to perform labor or furnish material for the same construction project").

on the King Air cannot be included in Dodson Aviation's lien. Dodson Aviation contends Mena and DIPI were its subcontractors and did not have separate contracts with Lopez.

### 1. Evidentiary Issues

Dodson Aviation's response to HLMP's motion relies in large part upon (1) the deposition of Lopez taken on June 11, 2008 in *Padron v. Lopez*, an action filed in the District Court of Franklin County, Kansas, and (2) Dodson Aviation's own deposition taken pursuant to Fed. R. Civ. P. 30(b)(6). HLMP argues the Court cannot consider Lopez's deposition because it is hearsay and not admissible under the former testimony exception codified at Fed. R. Evid. 804(b)(1). HLMP also argues Fed. R. Civ. P. 32(a)(3) prohibits Dodson Aviation from introducing into evidence at trial its own Rule 30(b)(6) deposition. As a result, HLMP contends Dodson Aviation is similarly prohibited from using the deposition as evidence in responding to a summary judgment motion.

At the summary judgment stage, the content or substance of any evidence relied upon must be admissible, but the evidence need not be submitted in a *form* that would be admissible at trial.[99] For example, Fed. R. Civ. P. 56(c)(1)(A) specifically permits a party to support its factual assertions by means of a deposition transcript or affidavit, even though these are *forms* of evidence that are usually inadmissible as hearsay at trial.[100] The theory allowing admission is that the same facts may ultimately be presented at trial in an admissible form.[101] As the Tenth Circuit has explained, a witness to a car accident could not submit his testimony at trial via affidavit because that statement

---

[99] *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005); *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)) (emphasis added).

[100] *See* Fed. R. Civ. P. 56(c)(1)(A); *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010).

[101] *Trevizo*, 455 F.3d at 1160.

would be hearsay; at the summary judgment stage, however, the affidavit is proper because its content – the eyewitness account of the affiant – is admissible.[102]

Courts should, however, disregard any inadmissible statements contained in affidavits or deposition transcripts because those statements could not be presented at trial in any form.[103] Thus, although evidence presented in the form of an affidavit at the summary judgment stage can be "converted" in form into live testimony at trial, the content or substance must be otherwise admissible, and any hearsay contained in an affidavit or deposition remains hearsay beyond a court's consideration.[104] The requirement that the substance of the evidence be admissible is explicit in Fed. R. Civ. P. 56, which provides that an affidavit or declaration must "set out facts that would be admissible in evidence," and also implicit in a court's role at the summary judgment stage.[105] To determine whether genuine issues of material fact make a trial necessary, a court necessarily may consider only the evidence that would be available to the trier of fact.[106]

In *Thomas v. Harvey*, defendant moved for summary judgment and submitted transcripts from hearings in other proceedings to support the facts asserted in its motion.[107] Plaintiff objected the transcripts were inadmissible as hearsay and did not fall within the exception for prior testimony

---

[102] *Bryant*, 432 F.3d at 1122.

[103] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).

[104] *Johnson*, 594 F.3d at 1210.

[105] *Argo*, 452 F.3d at 1199.

[106] *Id.*

[107] *Thomas v. Harvey*, 381 F. App'x 542, 546 (6th Cir. 2010).

in Fed. R. Evid. 804(b).[108]  The Sixth Circuit affirmed the district court's conclusion that the transcripts were not barred as hearsay because plaintiff objected only to the form of the evidence, rather than any specific testimony *within* the transcripts.[109]

Similar to the facts of *Thomas*, the only articulated basis for HLMP's objection is that the deposition transcript is purportedly hearsay and not admissible under the former testimony exception codified at Fed. R. Evid. 804(b)(1).  HLMP does not argue any testimony from the deposition constitutes hearsay.  HLMP points to no statements made by Lopez *within* the deposition transcript that would be inadmissible if Lopez were testifying at trial.  Because HLMP appears to object only to the form of evidence submitted by Dodson Aviation, rather than any of its content, the Court rejects HLMP's objection.[110]

It is not clear whether HLMP also objects that the deposition does not meet the requirements of Fed. R. Civ. P. 32, which governs the use of depositions in court hearings and trial.[111]  Under Fed. R. Civ. P. 32(a)(8), a deposition lawfully taken and, if required, filed in any federal – or state – court

---

[108] *Id*. at 547.

[109] *Id.* (emphasis added).

[110] *See Diamonds Plus, Inc. v. Kolber*, 960 F.2d 765, 767 (8th Cir. 1992) ("a deposition need not be admissible at trial in order to be properly considered in opposition to a motion for summary judgment.").

[111] Under certain circumstances, Fed. R. Civ. P. 32 authorizes the use of a deposition at trial or a hearing upon motion if the deposition is used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying.  The rules of evidence are to be applied as if the witness were present and testifying.  "Rule 32(a) creates of its own force an exception to the hearsay rule. . . . [T]he fact that the deponent is not present in court and that it is his out–of–court statement at the deposition that is being read is not in itself ground for objection." 8A Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 2143 (3d ed.); *see also Angelo v. Armstrong World Indus., Inc.*, 11 F.3d 957, 962–63 (10th Cir. 1993) (stating that Rule 32(a) creates an exception to the hearsay rules for deposition testimony).

action may be used in a later action *involving the same subject matter* between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action. This rule, however, is primarily applied as a limitation on introducing deposition testimony at trial.[112] Although some courts have applied Rule 32(a) to deposition testimony introduced in summary judgment proceedings, the Tenth Circuit has rejected this approach and stated that this "application represents an overly-expansive view of the Rule, given the purpose of the rule and the mechanics of summary judgment procedure."[113]

Fed. R. Civ. P. 56(c)(1)(A) expressly states that a party may cite to depositions or affidavits to support a party's factual assertions.[114] "Because a deposition is taken under oath and the deponent's responses are relatively spontaneous, it is one of the best forms of evidence for supporting or opposing a summary-judgment motion."[115] "[A] deposition is at least as good as an affidavit and should be usable whenever an affidavit would be permissible"[116] As one court has stated, there is no need to require a party presenting deposition testimony to obtain an affidavit that reiterates the information given in a deposition.[117] Accordingly, various courts, including the Tenth

---

[112] *Tingey v. Radionics*, 193 F. App'x 747, 765 (10th Cir. 2006).

[113] *Id.*; *see also Tormo v. Yormark*, 398 F. Supp. 1159, 1168 (D.N.J. 1975) (holding that Rule 32 does not govern use of deposition testimony at a hearing or a proceeding at which evidence in affidavit form is admissible).

[114] *See also* 10A Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 2722 (3d ed.).

[115] *Id.*

[116] *Diamonds Plus, Inc. v. Kolber*, 960 F.2d 765, 768 (8th Cir. 1992) (internal citations omitted).

[117] *Microsoft Corp. v. Very Competitive Computer Prods. Corp.*, 671 F. Supp. 1250, 1254 n.2 (N.D. Cal. 1987).

Circuit, have held that a deposition that did not meet the requirements of Fed. R. Civ. P. 32 is still admissible in a summary judgment proceeding if the deposition meets the requirements of an affidavit pursuant to Fed. R. Civ. P. 56.[118] This includes depositions taken for purposes of another case.[119]

Fed. R. Civ. P. 56(c)(4) requires that an affidavit must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." HLMP does not claim Lopez's testimony fails to meet these requirements. Accordingly, the Court will consider Lopez's testimony from the June 11, 2008

---

[118] *Tingey*, 193 F. App'x at 765–66 (holding that district court erred in excluding deposition testimony taken in a separate proceeding that did not comply with Rule 32 by analogizing the deposition to an affidavit); *Vondriska v. Cugno*, 368 F. App'x 7, 8–9 (11th Cir. 2010) (although deposition did not comply with Fed. R. Civ. P. 32(a), the district court erred in not considering the testimony when ruling on a motion for summary judgment because the deposition testimony met requirements of affidavit pursuant to Fed. R. Civ. P. 56 in that testimony was sworn, competent, based upon personal knowledge and set out facts admissible at trial); *Hoover v. Switlik Parachute Co.*, 663 F.2d 964, 966–67 (9th Cir. 1981) (permitting party to introduce deposition testimony for summary judgment purposes against a party who was not present at the deposition as required by Fed. R. Civ. P. 32 by construing the deposition as an affidavit); *Microsoft Corp.*, 671 F. Supp. at 1254 n.2 (deposition testimony given on personal knowledge that is presented in lieu of affidavits may be considered by court as substitute affidavits for purposes of motions that require support by affidavits, despite their inadmissibility under rule governing use of depositions); *see also S.E.C. v. Phan*, 500 F.3d 895, 913 (9th Cir. 2007) (holding that an interview given under penalty of perjury may be treated as a declaration and therefore may be considered in ruling on a motion for summary judgment even though Fed. R. Civ. P. 32(a) prevented its use as a formal deposition); *United States v. Fox*, 211 F. Supp. 25, 30 (E.D. La. 1962), *aff'd*, 334 F.2d 449 (5th Cir. 1964) (considering depositions in hearing on motion for preliminary injunction because depositions were at least as good as affidavits).

[119] *See Tingey*, 193 F. App'x at 765; *Gulf USA Corp. v. Fed. Ins. Co.*, 259 F.3d 1049, 1056 (9th Cir. 2001) (holding that sworn deposition testimony may be used by or against a party on summary judgment regardless of whether testimony was taken in a separate proceeding because such testimony is considered to be an affidavit under Fed. R. Civ. P. 56); *McClure v. Elmo Greer & Sons of Ky., LLC*, 369 F. Supp. 2d 832, 836–37 (N.D. W. Va. 2005) (considering deposition testimony from prior case); *see also* 10A Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 2722 (3d ed.).

deposition.

HLMP also argues Fed. R. Civ. P. 32(a)(3) prohibits a corporation from introducing into evidence at trial its own 30(b)(6) deposition. HLMP argues this result makes "eminent sense" because a Rule 30(b)(6) deposition is not based upon the personal knowledge of the corporation, but rather "represents an amalgamated position of the corporation, based on the collective knowledge of its many employees." HLMP also contends a Rule 30(b)(6) deposition offered by the corporation who gave it cannot be considered by the Court on a summary judgment motion because it is not based upon "personal knowledge."

"Deposition testimony is normally inadmissible hearsay, but Fed. R. Civ. P. 32(a) creates an exception to the hearsay rules."[120] Fed. R. Civ. P. 32(a)(3) allows the deposition of an *adverse party* to be used at trial or in hearing on a motion for any purpose. The implication, as HLMP points out, is that a party cannot introduce into evidence its own Rule 30(b)(6) deposition at trial unless there is some other basis under Rule 32 for its admission.[121] As discussed above, the Tenth Circuit has held that Rule 32 does not apply to motions for summary judgment. Thus, Dodson Aviation is not limited by Fed. R. Civ. P. 32 in relying upon its own Rule 30(b)(6) deposition at the summary judgment stage.

Further, a Rule 30(b)(6) deponent is not required to have personal knowledge as to the facts to which he testifies because he testifies as to the corporation's position on the matters set forth in

---

[120] *Angelo v. Armstrong World Indus., Inc.*, 11 F.3d 957, 962–63 (10th Cir. 1993).

[121] *See L-3 Commc'ns Corp. v. OSI Sys., Inc.*, No. 02 Civ. 9144(PAC), 2006 WL 988143, at *2 (S.D.N.Y. Apr. 13, 2006) (preventing corporation from introducing at trial its own 30(b)(6) deposition).

the deposition notice, not his personal opinion.[122]  Thus, the testimony of a Rule 30(b)(6) corporate

deponent "'may be presented on a motion for summary judgment, even though not based on personal

knowledge, because a Rule 30(b)(6) witness need not have personal knowledge of the facts to which

he or she testifies.'"[123]  HLMP has not cited to any authority where a corporation was prevented from

relying upon its own Rule 30(b)(6) deposition in a summary judgment proceeding because the

deponent purportedly lacked personal knowledge.

HLMP does not point out or explain which specific statements within the deposition are

purportedly not based upon the representative's personal knowledge.[124]  As a result, there is nothing

before the Court to demonstrate Dodson Aviation's Rule 30(b)(6) designee was not personally

knowledgeable about the matters to which he testified.  Accordingly, the Court will consider the

cited portions of Dodson Aviation's Rule 30(b)(6) deposition.

### 2.    Status of Mena and DIPI

As discussed above, HLMP argues Lopez entered into three contracts with three separate

---

[122] *PPM Finance, Inc. v. Norandal USA, Inc.*, 297 F. Supp. 2d 1072, 1085–86 (N.D. Ill. 2004).

[123] *Harris v. Vector Mktg. Corp.*, 656 F. Supp. 2d 1128, 1132 (N.D. Cal. 2009) (quoting 11-56 James Wm. Moore *et al.*, *Moore's Federal Practice* § 56.14); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Reichhold, Inc.*, No. 1:06CV939, 2009 WL 1579544, at *5 (M.D.N.C. June 2, 2009) (refusing to strike statements in affidavit purportedly not based upon affiant's personal knowledge because affiant had been designated as party's Rule 30(b)(6) designee); *Hijeck v. Menlo Logistics, Inc.*, No. 3:07-CV-0530-G, 2008 WL 465274, at *4 (N.D. Tex. Feb. 21, 2008) (refusing to strike affidavit that was purportedly not based upon personal knowledge of affiant because affiant had been designated as a Rule 30(b)(6) deposition witness, and "it is not necessary that [the affiant] have direct, personal knowledge of each and every fact discussed in her affidavit or her deposition.").

[124] HLMP does not argue any statements within the Rule 30(b)(6) deposition were hearsay, which could have resulted in a different outcome.  *See Century Pac., Inc. v. Hilton Hotels Corp*., 528 F. Supp. 2d 206, 215 n.5 (S.D.N.Y. 2007); *Cincinnati Ins. Co. v. Gray*, No. 1:08-CV-1694-TWP-TAB, 2010 WL 3522954, at *7 (S.D. Ind. Sept. 1, 2010).

entities for labor, equipment, and parts for the King Air: Dodson Aviation, DIPI, and Mena. Dodson Aviation contends Mena and DIPI were merely its subcontractors and did not have separate contracts with Lopez.

The Court has not found any authority defining a contractor or subcontractor in the context of personal property liens pursuant to K.S.A. 58-201. The Kansas Supreme Court, however, has defined those terms in the context of real property liens. Kansas courts apply the same general principles in personal property lien cases as cases involving mechanics' liens placed on real property.[125] Accordingly, the Court will use the Kansas Supreme Court's definitions of "contractor" and "subcontractor."

A contractor is "one who furnishes labor or materials under a contract direct with the owner for the improvement of property."[126] A subcontractor is "one who assumes a portion of a contract from the original contractor or another subcontractor for the performance of all or part of the services or work which the other has obligated himself to perform under contract with the owner."[127] The critical fact making one a contractor is his or her relationship to the owner of the property.[128] A contractor has a contract directly with the owner.[129] A subcontractor, on the other hand, does not

---

[125] *See Sec. Benefit Life Ins. Co. v. Fleming Cos.*, 908 P.2d 1315, 1319, 1320 (Kan. Ct. App. 1995).

[126] *Stewart v. Cunningham*, 548 P.2d 740, 743 (Kan. 1976).

[127] *Id.*

[128] *Alliance Steel, Inc. v. Piland*, 187 P.3d 111, 119 (Kan. Ct. App. 2008).

[129] *Id.*

have a separate contract with the owner of the property and is not a direct creditor of the owner.[130]

The determination of whether an individual or entity is a contractor or subcontractor appears to be a question of fact under most circumstances.[131] The controlling question as to whether a binding contract was entered into depends on the intention of the parties.[132] "When the evidence pertaining to the existence of a contract or the content of its terms is conflicting or permits more than one inference, a question of fact is presented."[133] As a result, summary judgment is rarely appropriate when questions of intent are at issue.[134] However, when there are no disputed material facts, the determination of the existence of a contract is a question of law for the Court's determination and is appropriate for summary judgment.[135]

Under Kansas law, in determining intent to form a contract, the test is objective, rather than subjective.[136] The relevant inquiry is the manifestation of a party's intent. Put another way, the inquiry focuses on whether the parties' outward expression of assent is sufficient to form a contract

---

[130] *See id.; Toler v. Satterthwaite*, 434 P.2d 814, 817–18 (Kan. 1967) (superceded on other grounds).

[131] *See Stewart*, 458 P.2d at 743; *Alliance Steel*, 187 P.3d at 117–19. Courts from other jurisdictions have held that the determination of whether an individual or entity is acting as a contractor or subcontractor is a question of fact. *Taylor v. King*, 994 A.2d 330, 340 n.11 (Conn. App. Ct. 2010).

[132] *Sidwell Oil & Gas Co. v. Loyd*, 630 P.2d 1107, 1112 (Kan. 1981).

[133] *Nungesser v. Bryant*, 153 P.3d 1277, 1288 (Kan. 2007).

[134] *Inscho v. Exide Corp.*, 33 P.3d 249, 252–53 (Kan. Ct. App. 2001).

[135] *Nelson Farms, Inc. v. Cox*, No. 92,328, 2005 WL 638120, at *2 (Kan. Ct. App. Mar. 18, 2005) (citing *City of Topeka v. Watertower Place Dev. Group*, 959 P.2d 894 (Kan. 1998)); *see also Alliance Steel*, 187 P.3d at119 (granting summary judgment because there was no genuine issue of material fact regarding whether plaintiff was a contractor).

[136] *Sw. & Assocs., Inc. v. Steven Enters., LLC*, 88 P.3d 1246, 1249 (Kan. Ct. App. 2004).

not whether the subjective minds of the parties have met.[137] Thus, the Court will not focus on Lopez's subjective belief whether DIPI and Mena were subcontractors or contractors, but rather on the "outward expressions" of contractual assent.[138] Factors the Court could consider include how and by whom DIPI and Mena were contacted to perform work on the King Air; how DIPI and Mena were made aware of the scope of the repairs to be performed; whether there was an agreement between Dodson Aviation, DIPI and Mena that Dodson Aviation would be liable for payment for their services; with whom Lopez discussed the progress of the repairs; and how billing and payment were handled.[139]

The Court's task in resolving this issue is complicated by the fact that neither party has addressed many of the above factors. Further, there was no written contract between Lopez and Dodson Aviation or between Dodson Aviation and DIPI and/or Mena. The extent of the initial written communication appears to have been an email from Lopez to JR Dodson seeking a quote for the work to be performed on the King Air; however, Lopez did not address his letter to any specific company and did not otherwise indicate in his email which company he was seeking to hire.[140] Additionally, because JR Dodson held positions with both Dodson Aviation and DIPI, it is not always clear if he was acting on behalf of DIPI or Dodson Aviation in his interactions with Lopez.[141]

HLMP argues Mena and DIPI had separate direct contracts with Lopez based upon how the

---

[137] *Id.*

[138] *See id.*

[139] *See id.*

[140] Email from Hernan Lopez to JR Dodson (July 9, 2006), ECF No. 132-14.

[141] JR Dodson is the President of DIPI and the Vice President of Dodson Aviation. Dodson Aviation R. 30(b)(6) Dep. 4:25–5:3, ECF No. 132-6.

billing and payment for the King Air repairs were handled. HLMP relies upon the following facts. Robert Dodson, Sr., president of Dodson Aviation, testified he was not involved in deciding to send the King Air to Mena for the work performed there, and that it was Lopez's decision to send the plane to Mena.[142] On three different occasions – July 23, 2007, December 31, 2007, and February 26, 2008 – Mena sent invoices directly to Lopez.[143] Also on February 26, 2008, Mena sent a "statement" showing the total amount due from all of the prior invoices.[144] Mena has not been paid on any of its invoices.[145] On other occasions, when Dodson Aviation or DIPI sent planes *they owned* to Mena for work, they paid Mena for that work.[146]

At its Rule 30(b)(6) deposition, Dodson Aviation presented a compilation spreadsheet summarizing its claim for $484,894.50.[147] The first two lines on the compilation are for parts supplied for the King Air by DIPI, for which $98,552.29 and $2,500 are claimed.[148] Internal invoice

---

[142] Robert Dodson, Sr. Dep. 30:8–31:1, ECF No. 132-2.

[143] Mena Aerospace Invoices, ECF No. 132-9.

[144] *Id.*

[145] Robert Dodson, Sr. Dep. 64:15–17, ECF No. 132-2.

[146] JR Dodson Dep. 89:8–95:10, ECF No. 132-8. This fact is not probative because it relates to how Dodson Aviation paid Mena when Mena worked on planes owned by Dodson Aviation. Thus, these were not situations in which Mena was purportedly acting as a subcontractor of Dodson Aviation.

[147] Dodson Aviation R. 30(b)(6) Dep. 18:3–18, ECF No. 132-6; Compilation of Charges, ECF No. 132-19.

[148] Compilation of Charges, ECF No. 132-19.

reports from DIPI reflect that the customer for those parts was "grulos."[149]  The supporting invoices for the $98,552.29 were sent to Lopez at Grulosa, Inc.[150]

The third line item of the compilation spreadsheet purports to represent "Items Paid Direct to Vendors by Dodson" in the amount of $45,921.46, with sub-entries below that line.[151]  Eight invoices were produced to substantiate those charges.[152]  The first four invoices were billed to DIPI and the seventh and eighth invoices were directed to Dodson Services.[153]  Only the fifth invoice was directed to Dodson Aviation.[154]  The sixth invoice is from Dodson Aviation to Lopez.[155]  The fourth line of the compilation is for "Parts Shipped to Mena," in the amount of $8,372.07.[156]  The invoices substantiating that line item reflect they were billed by DIPI to Mena.[157]

Dodson Aviation had no involvement in determining the price of the parts used on the King Air.[158]  Rather, Robert Dodson, Sr. testified the pricing was determined by DIPI.[159]

---

[149] Invoice Reports, ECF Nos. 132-22 and 132-23.

[150] Invoices, ECF No. 132-24.

[151] Compilation of Charges, ECF No. 132-19.

[152] Vendor Invoices, ECF No. 132-25.

[153] *Id.*

[154] *Id.*

[155] *Id.*

[156] Compilation of Charges, ECF No. 132-19.

[157] Invoices for Parts Shipped to Mena, ECF No. 132-26.

[158] Robert Dodson, Sr. Dep. 54:14–55:13, ECF No. 132-2.

[159] *Id.*

On July 12, 2006, JR Dodson instructed Lopez to wire a $30,000 advance payment for the work to be performed by Mena to "Dodson International Parts, Inc."[160]  In 2007, Lopez wired another $30,000 advance payment to "Dodson International Parts, Inc."[161]  Lopez sent a separate $30,000 advance payment to Dodson Aviation.[162]

Based upon the above evidence, HLMP argues Lopez had separate contracts with Mena and DIPI.  HLMP argues that if DIPI and Mena were merely subcontractors, they would not have been sending invoices directly to Lopez or one of his companies, and Lopez would not have been sending payments to DIPI.  HLMP also contends the lack of involvement by Dodson Aviation in determining the pricing for parts shows it was legally a stranger to that aspect of the King Air's renovation.  Further, HLMP argues that Lopez's independent decision to send the plane to Mena for the work performed there belies any assertion that Mena was acting as a subcontractor of Dodson Aviation.

Dodson Aviation does not directly controvert any of the facts relied upon by HLMP.  Instead, Dodson Aviation  argues "Lopez made it very clear [Dodson Aviation] was the contractor for this repair" and cites to a broad range of pages from Lopez's June 11, 2008 deposition to support this assertion.  Although Dodson Aviation does not point to any specific statements made by Lopez within the range of cited pages, the Court has identified the following testimony that arguably supports Dodson Aviation's assertion.

> Q.     You say the certificate of airworthiness was issued in 2006 or
>        2007?

---

[160] Letter from JR Dodson to Hernan Lopez (July 12, 2006), ECF No. 132-27.

[161] Letter from Hernan Lopez to Bob Dodson (Feb. 11, 2007), ECF No. 132-28.

[162] Maier Dep. 18:7–19:4, ECF No. 132-29.

A.     2008. . . . That was done after all the work was performed by Dodson."[163]

Q.     You retained Dodson Aviation to perform all the work necessary to get the aircraft in an airworthy condition and to obtain the certificate of airworthiness?

A.     Correct.[164]

Q.     When did you retain Dodson Aviation to perform the work?

A.     Monday, July 9, 2006, at 6:41 p.m.

Q.     That's precise.

A.     It is.

Q.     And who did you contact at Dodson Aviation?

A.     J.R. Dodson.

Q.     And J.R. Dodson is located –

A.     Ottawa, Kansas.   I'm sorry.  He is located –

Q.     In Rantoul, Kansas?

A.     Rantoul.  Yes.  Rantoul.

Q.     That's in Franklin County, Kansas?

A.     Yes.

Q.     And you flew the airplane then or caused the airplane to be delivered to Dodson Aviation in Rantoul, Kansas or Ottawa, Kansas?

A.     No.  I flew the airplane to Mena, Arkansas.  The work was going to start at Mena in Arkansas.  That's another facility that Dodson had and operated."[165]

Q.     Why did you choose Dodson Aviation to perform the work on the aircraft?

A.     Nobody can sell you parts at a better price. Nobody.[166]

Q.     Did you discuss the scope of the work to be performed on the aircraft with Mr. Dodson?  Or you said you talked to J.R. Dodson.  Did you discuss the scope of work to be performed on the aircraft with him?

---

[163] Lopez Dep. 7:18–25, June 11, 2008, ECF No. 139-5.

[164] *Id*. 9:5–9.

[165] *Id*. 9:17–10:11.

[166] *Id*. 44:11–14.

A.     Yes, sir.  In full detail.[167]

JR Dodson testified he initially discussed the project with Lopez; he then introduced Lopez to Robert Dodson, Sr. at Dodson Aviation, after which time Lopez worked directly with Robert Dodson, Sr.[168]  At that time, Robert Dodson, Sr. was the Vice President of Dodson Aviation.[169]

As discussed previously, the Court cannot weigh the evidence presented on a summary judgment motion.  The Court must determine only whether Dodson Aviation has presented enough evidence to create a dispute of material fact.  Resolving all doubts in favor of Dodson Aviation and construing all evidence in the light most favorable to Dodson Aviation as the party opposing summary judgment,[170] Lopez's deposition testimony supports that he contacted Dodson Aviation to perform the repairs on the King Air.  This is also supported by the deposition testimony of Dodson Aviation's Rule 30(b)(6) deponent, who testified he put Lopez in contact with Robert Dodson, Sr. at Dodson Aviation to arrange for the repairs on the King Air.

In his July 9, 2006 email to JR Dodson, Lopez requested a quote for various services and/or repairs to the King Air, including painting and refurbishing its interior.[171]  According to Dodson Aviation's representative, the initial $250,000 estimate provided by Robert Dodson, Sr. including

---

[167] *Id*. 45:9–14.

[168] Dodson Aviation R. 30(b)(6) Dep. 83:22– 84:13, ECF No. 139-2.

[169] Robert Dodson, Sr. Dep. 31:12–23, ECF No. 132-2.

[170] *See Hunt v. Cromartie*, 526 U.S. 541, 550–55 (1999); *Ortiz v. Norton*, 254 F.3d 889, 896 (10th Cir. 2001) (at the summary judgment phase, all rational inferences from the evidence must be made in favor of the party opposing the summary judgment motion).

[171] Email from Hernan Lopez to JR Dodson (July 9, 2006), ECF No. 132-14.

repainting and refurbishing the King Air.[172]  However, Robert Dodson, Sr. understood that the

painting and interior work would need to be performed by Mena.[173]  Three days later, on July 12,

2006, JR Dodson instructed Lopez to wire a $30,000 advance payment for the work to be performed

by Mena to "Dodson International Parts, Inc."[174]  Arguably, Robert Dodson, Sr. would not provide

a quote for the work to be performed by Mena and DIPI would not receive an advance payment for

such work if Lopez had contracted directly with Mena.

      HLMP places great emphasis on how the repairs for the King Air were billed.  Although this

is factor for the Court to consider, it is not determinative of the issue.[175]  Further, the evidence of

billing and payment presented to the Court does not compel the conclusion that Lopez contracted

directly with DIPI and Mena.  For example, on February 9, 2008, when the work on the King Air

was complete or nearly complete, JR Dodson's assistant, Mary Snyder, sent to Lopez a "recap" of

the parts and labor due on the King Air.[176]  At the time she sent the "recap," Snyder worked for

DIPI.[177]  The recap included amounts due for services and/or parts provided by Mena, DIPI, and

---

[172] Dodson Aviation R. 30(b)(6) Dep. 86:1–6, ECF No. 132-6.

[173] Robert Dodson, Sr. Dep. 30:12–15, ECF No. 132-2.

[174] Letter from JR Dodson to Hernan Lopez (July 12, 2006), ECF No. 132-27.

[175] *See Stewart v. Cunningham*, 548 P.2d 740, 744 (Kan. 1976) (in determining whether plaintiff was a subcontractor or general contractor, where payments were directed was not determinative of the issue); *Sw. & Assocs., Inc. v. Steven Enters., LLC*, 88 P.3d 1246, 1249 (Kan. Ct. App. 2004) (where payments were directed was not determinative in deciding whether plaintiff was contractor or subcontractor).

[176] E-mail from Mary Snyder to Hernan Lopez (Feb. 8, 2008), ECF No. 132-16.

[177] Snyder Dep. 8:16–20, ECF No. 132-17.

34

Dodson Aviation.[178]  Although it is not clear why DIPI, rather than Dodson Aviation, sent the "recap," it is arguable that DIPI would not have included in its "recap" the amount each entity was owed if each entity had its own separate contract with Lopez.

The lack of Dodson Aviation's involvement in pricing the parts sold by DIPI is not determinative.  As explained in Dodson Aviation's 30(b)(6) deposition, Dodson Aviation charged Lopez with a flow-through price, meaning there was no mark up on the bill from the prices charged by DIPI.[179]

Further, the fact that Lopez was directed to send payments directly to DIPI does not necessarily indicate Lopez contracted directly with DIPI.  A possible inference is that it was simply easier for payments to be sent directly to the entities who performed the repairs or supplied the parts rather than funneling all payments through Dodson Aviation.

There is sufficient evidence from which a reasonable person could find that Mena and DIPI were subcontractors of Dodson Aviation. Although HLMP's evidence might allow the fact finder to find that Lopez had separate contracts with Mena and DIPI, it does not require that the fact finder do so and is susceptible to more than one reasonable inference viewed in the light most favorable to Dodson Aviation.  Accordingly, the Court denies HLMP's Motion for Partial Summary Judgment on this issue.  As a result, whether DIPI and Mena were subcontractors of Dodson Aviation or had their own separate contracts with Lopez represents a genuine issue of fact for trial.

C.    Unjust Enrichment

---

[178] E-mail from Mary Snyder to Hernan Lopez (Feb. 8, 2008), ECF No. 132-16.

[179] Dodson Aviation R. 30(b)(6) Dep. 80:13–81:21, ECF No. 139-2.

The "basic elements on a claim based on a theory of unjust enrichment are threefold: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value."[180]  A quasi-contract based on unjust enrichment is created on the basis of justice and equity, regardless of the assent of the parties, and is a legal device used to enforce non-contractual duties.[181]  The question of whether a party may recover damages based upon a theory of unjust enrichment is a question of law.[182]  The payment of the debt of another constitutes a benefit conferred, and thus may satisfy the first element of an unjust enrichment claim.[183]

In September 2008, HLMP or its President (Padron) paid $225,000 to 1st Source Bank to clear a lien 1st Source Bank held on the King Air.  HLMP claims it is entitled to offset up to $225,000 from any amounts otherwise due Dodson Aviation because Dodson Aviation and/or DIPI were unjustly enriched by this payment.  More specifically, HLMP contends the $225,000 payment to 1st Source Bank benefitted Dodson Aviation and/or DIPI because it reduced the amount of debt they owed to 1st Source Bank.  Both parties move for summary judgment on this claim.

As a preliminary matter, the parties dispute whether the $225,000 payment to 1st Source Bank was made by HLMP or HLMP's President (Padron) in his individual capacity.  On March 18,

---

[180] *J.W. Thompson Co. v. Welles Prods. Corp.*, 758 P.2d 738, 745 (Kan. 1988).

[181] *Sec. Benefit Life Ins. Corp. v. Fleming Cos.*, 908 P.2d 1315, 1323 (Kan. Ct. App. 1995).

[182] *Ireland v. Dodson*, 704 F. Supp. 2d 1128, 1142–43 (D. Kan. 2010) (applying Kansas law).

[183] *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 352 (Md. 2007).

2008, HLMP and Padron initiated a lawsuit in Miami-Dade County, Florida, against Lopez, PTC, Dodson Aviation, DIPI, and 1st Source Bank, alleging *inter alia* that Lopez conspired to defraud Padron into organizing and investing capital in HLMP.[184]  On August 15, 2008, 1st Source Bank, Padron, and HLMP entered into a Settlement Agreement to resolve the issues between them in the Florida litigation.[185]  The Settlement Agreement states, "*Padron* agrees to pay the sum of $225,000" to 1st Source Bank in full satisfaction of 1st Source Bank's lien on the King Air.[186]  In an affidavit, Padron explains that pursuant to the authority granted to him as President under HLMP's bylaws, he *advanced* on behalf of HLMP the $225,000 payment to release the lien; he purportedly took this action because HLMP had no other assets beyond the King Air.[187]  Padron testifies this created a debt owed to him by HLMP.[188]

Dodson Aviation contends the agreement between Padron and Lopez provides they will act together in making material decisions regarding the King Air.  Dodson Aviation, however, has neither presented any evidence Lopez did not approve of Padron's action nor explained how this necessarily nullifies the loan.  Dodson Aviation also argues Padron was not authorized under HLMP's bylaws to borrow the $225,000 on behalf of HLMP, but similarly has not explained how this automatically negates his action.  Accordingly, the Court concludes there is no genuine dispute of fact regarding whether HLMP is liable for the $225,000 payment to 1st Source Bank.

---

[184] Verified Fl. Compl., ECF No. 132-38.

[185] Settlement Agreement, ECF No. 139-15.

[186] *Id.* § 2 (emphasis added).

[187] Padron Decl., ECF No. 132-3.

[188] *Id.*

1.    Benefit

As mentioned above, HLMP contends the $225,000 payment to 1st Source Bank benefitted Dodson Aviation and/or DIPI because it reduced the amount of debt they owed to 1st Source Bank. The following facts are uncontroverted.

Between 1997 and 2000, Dodson Aviation borrowed $9,069,489 from 1st Source Bank through a series of Aircraft Security Agreements.[189]  On November 26, 1997, 1st Source Bank entered into a separate Aircraft Security Agreement with Dodson Aviation, which was secured by a Douglass DC-3 ("DC-3") aircraft that was owned by Dodson Aviation.[190]  On September 1, 2006, Dodson Aviation leased the DC-3 to Dee Cee Tres Sales and Leasing Corporation ("Dee Cee Tres") along with two Pratt & Whitney engines.[191]  Dee Cee Tres' payments under the lease were to be sent directly to 1st Source Bank because 1st Source Bank had been assigned the payments as collateral for its loans to Dodson Aviation.[192]

After Dee Cee Tres defaulted on the DC-3 lease, the lease was amended on January 9, 2007.[193]  Under this amendment, PTC, the then owner of the King Air, granted 1st Source Bank a lien on the King Air to secure Dee Cee Tres' obligations under the DC-3 lease.[194]  On July 17, 2007, Dodson Aviation sold the DC-3 to DIPI, and DIPI assumed Dodson Aviation's debt secured by the

---

[189] Aircraft Security Agreements, ECF Nos. 132-30, 132-31, 132-32, 132-33.

[190] Assumption and Amendment Agreement, ECF No. 132-34.

[191] Aircraft Lease Agreement, ECF No. 132-35.  Lopez was also the President of Dee Cee Tres.  *Id.*

[192] *Id.* § 20 and Ex. 7 attached thereto.

[193] Aircraft Lease Agreement Second Amendment, ECF No. 132-37.

[194] *Id.*

DC-3; at that time, 1st Source Bank did not release Dodson Aviation from its liability secured by the lien on the DC-3.[195]

Also on July 17, 2007, DIPI executed a separate Consolidation Note, in which it assumed liability for four other loans from 1st Source Bank to Dodson Aviation, amounting to $4.7 million.[196] Under the terms of the Loan and Security Agreement that DIPI executed in connection with the Consolidation Note, Dodson Aviation was not released from any of its obligations under the four notes assumed by DIPI.[197] Rather, Dodson Aviation would be released from liability on the loans only if 1st Source Bank separately and specifically released Dodson Aviation.[198]

The DC-3 lease agreement contained a provision whereby Dee Cee Tres could purchase the DC-3.[199] On January 10, 2008, 1st Source Bank, DIPI, Dee Cee Tres, PTC, and Lopez entered into an Aircraft Transfer Agreement by which Dee Cee Tres purchased the DC-3 for $479,000, which corresponded to the approximate remaining balance due under the lease agreement.[200] Dee Cee Tres agreed to pay the purchase price by delivering a Loan and Security Agreement ("the Purchase Loan") in favor of 1st Source Bank, which was secured by, *inter alia*, a continuing security interest in the King Air.[201] The Aircraft Transfer Agreement also indicates 1st Source Bank would credit any

---

[195] Assumption and Amendment Agreement, ECF No. 132-34.

[196] Consolidation Note, ECF No. 132-39.

[197] Loan and Security Agreement, Ex. A § III.A, ECF No. 132-40.

[198] *Id.*

[199] Aircraft Lease Agreement Second Amendment ¶ 12, ECF No. 132-37.

[200] Aircraft Transfer Agreement, ECF No. 132-41; Buhr Decl. ¶ 7, ECF No. 132-13.

[201] Aircraft Transfer Agreement § 2, ECF No. 132-41.

and all payments it receives from Dee Cee Tres under the Purchase Loan as a principal payment on the Consolidation Note as and when received.[202] In April 2008, 1st Source Bank received a $50,000 payment from Dee Cee Tres, which was credited to Dee Cee Tres' Purchase Loan and was also *to be* "applied to recovery on the Dodson note."[203]

As discussed above, 1st Source Bank, Padron, and HLMP negotiated a $225,000 payment and release of the lien on the King Air.[204] In September 2008, $225,000 was disbursed to 1st Source Bank from Padron on behalf of HLMP. In October 2008, 1st Source Bank executed a release of its lien on the DC-3 through a document in which it identified the debtor as Dodson Aviation, Inc., not DIPI.[205]

HLMP argues Dodson Aviation and/or DIPI were benefitted based upon the following sequence of events: (1) Dodson Aviation was indebted to 1st Source Bank on various loans; (2) in a Consolidation Note, DIPI assumed Dodson Aviation's debt to 1st Source Bank; (3) Dodson Aviation, however, was not released from its liability to 1st Source Bank, resulting in Dodson Aviation and DIPI being jointly liable on the debt; (4) DIPI sold a DC-3 airplane to Dee Cee Tres in exchange for $479,000; (5) Dee Cee Tres financed the purchase of the DC-3 by borrowing $479,000 from 1st Source Bank, which was secured by a continuing lien on the King Air; (6) any payments made by Dee Cee Tres under the Purchase Loan from 1st Source Bank were to be credited as a principal payment on the Consolidation Note when the payments were received; (7) HLMP's

---

[202] *Id.*

[203] E-mail from Helen Atkinson to Beth Van Parys and Jeff Buhr (Apr. 2, 2008), ECF No. 132-42. This apparently refers to DIPI's Consolidation Note.

[204] Settlement Agreement, ECF No. 139-15.

[205] Release, ECF No. 132-46. DIPI was listed as a debtor only for two engines. *Id.*

$225,000 payment to 1ˢᵗ Source Bank was applied to Dee Cee Tres' Purchase Loan; and (8) this payment also reduced Dodson Aviation's and/or DIPI's indebtedness to 1ˢᵗ Source Bank under the Consolidation Note.

HLMP characterizes Dodson Aviation, DIPI, and Dee Cee Tres as being co-debtors or joint debtors on $479,000 of the amount originally loaned to Dodson Aviation. Dodson Aviation argues it was not benefitted by the $225,000 payment because it had already been released from any debt to 1ˢᵗ Source Bank assumed by DIPI under the Consolidation Note by the time HLMP made the $225,000 payment.

There appears to be no dispute that the Assumption and Amendment Agreement dated July 17, 2007 did not release Dodson Aviation from its liability to 1ˢᵗ Source Bank. Paragraph 4 specifically provides, "[Dodson Aviation] acknowledges and agrees that this Assumption and Assignment Agreement shall not in any manner release [Dodson Aviation] from its obligations under the Security Agreement . . ."[206] Similarly, in the Loan and Security Agreement executed by DIPI in connection with the Consolidation Note, 1ˢᵗ Source Bank stated that Dodson Aviation was not released from any of its obligations under the four loans assumed by DIPI.[207] This is confirmed by an affidavit submitted to the United States District Court for the Northern District of Indiana by Jeff Buhr, 1ˢᵗ Source Bank's Senior Vice President and person who was primarily responsible for managing the credit relationship with Dodson Aviation and DIPI. In that affidavit, Buhr swears, "The restructuring of Dodson Aviation's debt, the execution of the *Consolidation Note* by Dodson

---

[206] Assumption and Amendment Agreement ¶ 4, ECF No. 132-34.

[207] Loan and Security Agreement, Ex. A § III.A, ECF No. 132-40.

International, and the subsequent execution of a *Loan and Security Agreement* by Dee Cee Tres did not operate to discharge or release any of Dodson Aviation's obligations to 1st Source."[208]

Dodson Aviation, however, contends 1st Source Bank intended to release it from liability once certain conditions were met and that Dodson Aviation satisfied those conditions by the time the $225,000 payment was made. On July 17, 2007, the same day the Consolidation Note was executed, 1st Source Bank provided a letter to Dodson Aviation in which it committed to discharge and release Dodson Aviation from any liability on the loans assumed by DIPI in the Consolidation Note upon (i) execution and delivery to Bank of all Loan Documents; (ii) receipt by 1st Source Bank of confirmation of the transfer of title to the Transferred Assets by Dodson Aviation to DIPI; and (iii) the perfection and confirmation of the required priority status of the applicable priority security interests in favor of 1st Source Bank with respect to any and all collateral referenced in the Loan Documents.[209]

During his deposition, Buhr testified the primary concern before releasing Dodson Aviation from its liability was that Dodson Aviation transfer title of the DC-3, including de-registering the aircraft from Dodson Aviation and re-registering the aircraft to DIPI.[210] Buhr further testified that although 1st Source Bank had not delivered a written release as contemplated by the Commitment Letter, Dodson Aviation had met the conditions when the de-registration of the aircraft had been

---

[208] Buhr Decl. ¶ 10 (emphasis in original), ECF No. 132-13.

[209] Letter from Jeff Buhr to Bob Dodson, Sr. (dated July 17, 2007) ("Commitment Letter"), ECF No. 139-13.

[210] Buhr Dep. 93:5–24, 96:3–7, ECF No. 139-6.

completed.[211]  Buhr also stated Dodson Aviation was not looked to in any shape, manner or form to support the Dee Cee Tres Purchase Loan because Dodson Aviation had met the conditions to be released from liability on its prior notes with 1st Source Bank.[212]

HLMP points out that 1st Source Bank had not issued a written release by the time of Buhr's deposition despite the fact that the Commitment Letter came to light in August 2009, several months prior to his deposition.[213]  There is still no evidence 1st Source Bank has ever issued a written release. HLMP argues the only conclusion that can be drawn from this is that regardless of Buhr's testimony, his superiors at 1st Source Bank have not been willing to release Dodson Aviation from its liability.

At his deposition, Buhr explained he simply forgot to send a written release letter.[214]  Under the Commitment Letter, the release was to be signed by an authorized officer of 1st Source Bank.[215] Buhr was a Senior Vice President and the individual at 1st Source Bank who was primarily responsible for managing the credit relationship with Dodson Aviation.[216]  HLMP has presented no evidence that anyone else other than Buhr was required to approve the release.

HLMP also apparently argues Buhr's affidavit submitted to the District Court in Indiana contradicts his deposition testimony.  HLMP argues Buhr's affidavit essentially states the following: "Because [Dodson Aviation] remained obligated on the 1st Source debt at the time [Defendant] made

---

[211] *Id.* 95:18–96:25.  The de-registration appears to have been completed in February 2008.  *Id.* 141:5–25.

[212] *Id.* 155:11–156:14.

[213] Buhr was deposed in December 2009.

[214] Buhr Dep. 93:5–24, 96:3–7, ECF No. 139-6.

[215] Commitment Letter, ECF No. 139-13.

[216] *Id.*; Buhr Decl. ¶ 1, ECF No. 132-13.

the $225,000 payment to 1st Source, this reduced [Dodson Aviation's] obligation to 1st Source, and thereby provided [Dodson Aviation] with a benefit."[217] HLMP, however, misreads Buhr's affidavit. In his affidavit, Buhr states, "the proceeds from the lease and sale of the DC-3 aircraft (received from Dee Cee Tres or affiliates, or its sublease) directly resulted in credits against the obligations evidenced by the *Consolidation Note*, and thus served to reduce the obligations of Dodson International and Dodson Aviation."[218] Buhr mentions only payments made by Dee Cee Tres; he does not address the $225,000 payment made by HLMP, which occurred after Dodson Aviation had met the conditions to be released from its obligations to 1st Source Bank. Further, the Settlement Agreement between 1st Source Bank, Padron, and HLMP refers to only DIPI and JR Dodson as being secondarily liable on debts to 1st Source Bank and receiving a benefit by reducing their "potential exposure" to 1st Source Bank.[219] There is no mention of Dodson Aviation.

HLMP further contends the Commitment Letter contained three conditions that had to be satisfied before Dodson Aviation would be released, and then only by virtue of a "separate writing executed and delivered by an authorized officer of the Bank." HLMP contends de-registration of the assets was insufficient and that this concept appears nowhere in the Commitment Letter.

In his deposition, Buhr explained de-registration was part of the titling of assets described in the second condition of the Commitment Letter.[220] Although Buhr testified that de-registration was 1st Source Bank's main concern and that the conditions for release were met once de-registration

---

[217] Reply Mem. in Supp. of Def.'s Mot. for Partial Summ. J. at 15, ECF No. 145.

[218] Buhr Decl. ¶ 11, ECF No. 132-13.

[219] Settlement Agreement ¶ 9, ECF No. 139-15.

[220] Buhr Dep. 96:3–7, ECF No. 139-6.

occurred, he never stated de-registration was the only condition. It does not appear Buhr was ever asked whether the other conditions described in the Commitment Letter had been met. Further, under Indiana law, the performance of a condition precedent may be waived.[221]

Here, Buhr testified Dodson Aviation was not looked to in any shape, manner or form to support the Dee Cee Tres Purchase Loan because it had met the conditions to be released from its obligations to 1st Source Bank, and HLMP has not presented evidence to controvert this testimony. When applying principles of equity to determine whether a benefit has been conferred, the Court will not conclude Dodson Aviation was still liable to 1st Source Bank when 1st Source Bank's own representative testified he intended to provide a written release to Dodson Aviation but simply forgot to do so.

Even assuming Dodson Aviation was not released from liability to 1st Source Bank, the $225,000 payment to 1st Source Bank did not confer a benefit upon Dodson Aviation sufficient to support a claim for unjust enrichment, as will be discussed with respect to DIPI below.

Dodson Aviation also argues HLMP cannot pursue an unjust enrichment theory because the $225,000 was paid pursuant to a contract. It is well established that quasi-contractual remedies such as unjust enrichment are not available when an enforceable express contract regulates the parties' relations with respect to the disputed issue.[222] However, the rule barring an action on an implied contract where an express contract exists appears to apply only where the parties to both contracts

---

[221] *Harrison v. Thomas*, 761 N.E.2d 816, 820 (Ind. 2002). The Consolidation Note was to be governed according to Indiana law. Consolidation Note ¶ 7, ECF No. 132-39.

[222] *School-Link Techs., Inc. v. Applied Res., Inc.*, 471 F. Supp. 2d 1101, 1116 (D. Kan. 2007).

are the same.[223]  Here, neither Dodson Aviation nor DIPI were parties to the Settlement Agreement.

Thus, HLMP does not appear to be barred from pursuing an unjust enrichment claim against Dodson

Aviation or DIPI by the existence of the Settlement Agreement.

The Court will now address whether DIPI received a benefit from the payment of the

$225,000. Dodson Aviation argues DIPI was a mere guarantor of Dee Cee Tres' debt under the

Purchase Loan and that there was no liability on the guaranty because the Purchase Loan was never

in default.  The Aircraft Transfer Agreement states that the Purchase Loan would be secured by

"guarantees of payment by Dodson [International] and Lopez."[224]  HLMP does not argue DIPI

benefitted in its capacity as a guarantor under the Purchase Loan.  HLMP argues DIPI was benefitted

because its indebtedness under the Consolidation Note was reduced.  Thus, DIPI's liability under

the Purchase Loan as a guarantor is not at issue.

Dodson Aviation further contends 1st Source had a hierarchy of assets to collect against under

the Aircraft Transfer Agreement and that DIPI was at the bottom of a long list.  Although the

Aircraft Transfer Agreement listed various ways in which the Purchase Loan was secured, there does

not appear to be any requirement that 1st Source Bank proceed against the collateral or borrowers

in any particular order and Dodson Aviation does not cite to any such provision in the agreement.[225]

Dodson Aviation also argues the Consolidation Note was not credited by HLMP's $225,000

payment.  According to Dodson Aviation, 1st Source Bank credited DIPI's loan account upon Dee

Cee Tres' execution of the $479,000 Purchase Loan.  Although 1st Source Bank credited $479,000

---

[223] *See Vulcan Materials Co. v. Atofina Chemicals Inc.*, 355 F. Supp. 2d 1214, 1239–1240 (D. Kan. 2005).

[224] Aircraft Transfer Agreement § 2, ECF No. 132-41.

[225] *Id.*

46

to the Consolidation Note when the loan to Dee Cee Tres was made, this was done as a matter of internal accounting.[226] Under Section 2 of the Aircraft Transfer Agreement, 1st Source Bank indicates it "will credit any and all payments it receives from [Dee Cee Tres] under the Purchase Loan as a principal payment on the [Consolidation] Note, *as and when received.*[227] Further, in April 2008, 1st Source Bank received a $50,000 payment from Dee Cee Tres, which was credited to Dee Cee Tres and was also *to be* "applied to recovery on the Dodson note."[228] However, no evidence has been presented that the $50,000 payment was ever actually applied to the Consolidation Note and no evidence has been presented demonstrating the $225,000 payment was actually applied to the Consolidation Note. Thus, there is a genuine dispute of fact that prevents HLMP's motion from being granted.

Even assuming HLMP's $225,000 payment to 1st Source Bank reduced DIPI's obligations under the Consolidation Note, this does not confer a "benefit" upon DIPI sufficient to sustain a theory of unjust enrichment. As discussed above, 1st Source Bank, DIPI, Dee Cee Tres, PTC, and Lopez entered into an Aircraft Transfer Agreement in which Dee Cee Tres purchased a DC-3 from DIPI for $479,000.[229] Dee Cee Tres agreed to pay the purchase price by delivering a Loan and

---

[226] Buhr Decl. ¶ 9, ECF No. 132-13; Summary of Payments, ECF No. 139-14.

[227] Aircraft Transfer Agreement § 2, ECF No. 132-41.

[228] E-mail from Helen Atkinson to Beth Van Parys and Jeff Buhr (Apr. 2, 2008), ECF No. 132-42. This apparently refers to DIPI's Consolidation Note.

[229] Aircraft Transfer Agreement, ECF No. 132-41; Buhr Decl. ¶ 7, ECF No. 132-13.

Security Agreement ("Purchase Loan") in favor of 1st Source Bank, which was secured by, *inter alia*, a continuing security interest in the King Air.[230]

HLMP made the $225,000 payment to remove the lien on the King Air because at least this amount was still due from Dee Cee Tres under the Purchase Loan. The $225,000 payment was then credited to Dee Cee Tres' obligations under the Purchase Loan.[231] Essentially, HLMP paid Dee Cee Tres' debt to 1st Source Bank. DIPI was not jointly liable for Dee Cee Tres' obligations under the Purchase Loan.[232]

Because of how the parties had structured the purchase of the DC-3, the effect of the $225,000 payment might have been to reduce DIPI's obligations to 1st Source Bank. Rather than paying the $479,000 purchase price directly to DIPI, the parties agreed to apply the payments made by Dee Cee Tres on the Purchase Loan to DIPI's obligation to 1st Source Bank under the Consolidation Note. In his affidavit, Buhr confirms this by stating, "the proceeds from the lease and sale of the DC-3 aircraft (received from Dee Cee Tres or affiliates, or is sublease) directly resulted in credits against the obligations evidence by the *Consolidation Note*, and thus served to reduce the obligations of Dodson International and Dodson Aviation."[233]

DIPI was due a total of $479,000 from Dee Cee Tres under the Aircraft Transfer Agreement. At the time HLMP made the $225,000 payment to remove the lien on the King Air, at least some of this amount was still due DIPI under the Aircraft Transfer Agreement, albeit from Dee Cee Tres,

---

[230] Aircraft Transfer Agreement § 2, ECF No. 132-41; Loan and Security Agreement, ECF No. 128-6.

[231] Summary of Payments, ECF No. 139-14.

[232] *See* Loan and Security Agreement, ECF No. 128-6.

[233] Buhr Decl. ¶ 11, ECF No. 132-13.

just as 1st Source Bank was owed the $225,000 under the Purchase Loan.[234]  In essence, by making

the $225,000 payment, HLMP performed Dee Cee Tres' obligations to both 1st Source Bank and

DIPI under the Purchase Loan and Aircraft Transfer Agreement, respectively.  DIPI was not

"enriched" because it did not receive anything more than what it was entitled to under the Aircraft

Transfer Agreement.  As a result, DIPI did not receive a sufficient benefit to support a claim of

unjust enrichment.[235]  If any entity was benefitted by the $225,000 payment, it appears to have been

Dee Cee Tres.

2.      Inequity

HLMP must also demonstrate acceptance or retention of the benefit under such

circumstances as to make it inequitable for the opposing party to retain the benefit without payment

of its value.[236]  Even if DIPI or Dodson Aviation were benefitted by the $225,000 payment, the

Court does not find the retention of any such benefit to be inequitable.

HLMP argues it would be inequitable not to give it an offset for the $225,000 payment

because it would result in "double recovery" to Dodson Aviation.  HLMP contends Dodson Aviation

---

[234] Summary of Payments, ECF No. 141-5 (reflecting that at the time the $225,000 payment was made, Dee Cee Tres had paid only $276,667).  There is no evidence DIPI was credited more than the remaining amount due to it under the Aircraft Transfer Agreement.

[235] Although the Court has not found any Kansas authority, courts in other jurisdictions have held that the "benefit" under an unjust enrichment claim must something to which the other party is entitled.  *Abacus Fed. Sav. Bank v. Lim*, 905 N.Y.S.2d 585, 587 (N.Y. App. Div. 2010) (defining unjust enrichment as receipt by one party of money or a benefit to which it is not "entitled"); *Southtown Plumbing, Inc. v. Har-Ned Lumber Co.*, 493 N.W.2d 137, 140 (Minn. Ct. App. 1992) (to establish an unjust enrichment claim it must be shown that a party has knowingly received something of value, *not being entitled to the benefit*, and under circumstances that would make it unjust to permit its retention).

[236] *J.W. Thompson Co. v. Welles Prods. Corp.*, 758 P.2d 738, 745 (Kan. 1988).

(or DIPI) would have the benefit of a $225,000 debt reduction and receive the entire amount the Court finds due on its claim for repairs to the King Air.

As discussed above, DIPI was due a total of $479,000 from Dee Cee Tres under the Aircraft Transfer Agreement. Under Section 2 of the Aircraft Transfer Agreement, 1st Source Bank would credit any and all payments it received from Dee Cee Tres under the Purchase Loan as a principal payment on the Consolidation Note, as and when received. Thus, at the time HLMP made the $225,000 payment to remove the lien on the King Air, at least some of this amount was still due DIPI under the Aircraft Transfer Agreement, albeit from Dee Cee Tres.[237] Neither DIPI nor Dodson Aviation has received anything more than that for which they bargained and provided consideration.[238] This is confirmed by Buhr's affidavit in which he states:

> As explained above, the proceeds from the lease and sale of the DC-3 aircraft (received from Dee Cee Tres or affiliates, or its sublease) directly resulted in credits against the obligations evidenced by the *Consolidation Note*, and thus served to reduce the obligations of Dodson International and Dodson Aviation. The total proceeds received under the *Lease Agreement* and loan made to Dee Cee Tres were all related to the original lease/purchase price of the DC-3, so Dodson International and Dodson Aviation obtained no benefit beyond that bargained for in connection with the *Lease Agreement*.[239]

---

[237] Summary of Payments, ECF No. 141-5 (reflecting that at the time the $225,000 payment was made, Dee Cee Tres had paid only $276,667). There is no evidence DIPI was credited more than the remaining amount due it under the Aircraft Transfer Agreement.

[238] *See Holiday Dev. Co. v. J.A. Tobin Constr. Co.*, 549 P.2d 1376, 1383 (Kan. 1976) (explaining in an unjust enrichment case involving a subcontractor that "the prime contractor may already have been paid in full by the owner for the improvements furnished by the subcontractor or materialman and there really is no unjust enrichment"); *see also Paschall's, Inc. v. J.P. Dozier*, 407 S.W.2d 150, 155 (Tenn. 1966) ("The most significant requirement for recovery on quasi contract is that the enrichment to the defendant be unjust. Consequently, if the landowner has given any consideration to any person for the improvements, it would not be unjust for him to retain the benefit without paying the furnisher.").

[239] Buhr Decl. ¶ 11, ECF No. 132-13.

Allowing an offset of $225,000 would effectively reduce the consideration DIPI was to receive under the Aircraft Transfer Agreement (or Dodson Aviation received under the original lease agreement). Under these circumstances, the Court does not find it inequitable for DIPI (or Dodson Aviation) to retain the benefit it received, if any, by HLMP's $225,000 payment to 1st Source Bank.

The Court has determined neither Dodson Aviation nor DIPI were benefitted by the $225,000 payment to justify a claim of unjust enrichment. Even assuming Dodson Aviation and/or DIPI were benefitted by the $225,000 payment, the Court has found it would not be inequitable for them to retain any such benefit.

Accordingly,

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Partial Summary Judgment (ECF No. 127) is hereby granted. The Court finds Defendant is not entitled to an offset of $225,000 for any payments made to 1st Source Bank.

**IT IS FURTHER ORDERED** that Defendant's Motion for Partial Summary Judgment (ECF No. 131) is hereby granted in part and denied in part as described herein. The Court finds Plaintiff is not entitled to prejudgment interest. There is a dispute of fact whether DIPI and Mena were subcontractors of Dodson Aviation or whether Lopez had separate contracts with DIPI and Mena.

**IT IS SO ORDERED**.

Dated this 31st day of March, 2011 at Topeka, Kansas.

s/K. Gary Sebelius
K. Gary Sebelius
U.S. Magistrate Judge