IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| DODSON AVIATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-4102-KGS |
| | ) | |
| HLMP AVIATION CORP., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This Order constitutes the Court's findings of fact and conclusions of law following a bench trial held during the week of June 13, 2011 and on June 20, 2011 and June 27, 2011.

## I.   INTRODUCTION

Plaintiff Dodson Aviation, Inc. ("DAI" or "Plaintiff") brought this action in the District Court of Franklin County, Kansas to foreclose a mechanics' lien pursuant to K.S.A. 58-201. The lien was filed against a Beech King Air Model 200 aircraft, Serial Number BB-48, with an FAA tail number of N750HL ("the King Air" or "the plane"). Defendant HLMP Aviation Corp. ("HLMP" or "Defendant") removed the action to federal court.

Pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction because the amount in controversy exceeds $75,000, exclusive of interests and costs, and DAI and HLMP are citizens of different states. The parties agreed the matter would be tried to the Court without a jury, and consented to trial before the undersigned United States Magistrate Judge for all purposes, including the entry of final judgment.

## II.    FINDINGS OF FACT[1]

DAI is a Kansas corporation with its principal place of business in Ottawa, Kansas. DAI's primary business is purchasing, repairing, and then re-selling aircraft. Very little of DAI's business involves third-party repairs, in which DAI repairs or renovates planes owned by others. DAI does not do any interior work on planes. In 2007, Robert Dodson Sr. ("Bob Dodson") was the president of DAI. At the time of trial, Robert Dodson, Jr. ("JR Dodson") was the vice-president of DAI.[2]

Dodson International Parts, Inc. ("DIPI") is a Kansas corporation with its principal place of business in Rantoul, Kansas. DIPI's primary business is buying and selling aircraft parts. JR Dodson is the president and sole owner of DIPI.

Mena Aerospace, Inc. ("Mena") is an Arkansas corporation with its principal place of business in Mena, Arkansas. Mena's primary business is painting aircraft, performing general aircraft maintenance, and repairing and refurbishing aircraft interior. Mena primarily works on aircraft owned by DAI. Bob Dodson is the majority shareholder of Mena, and at all relevant times, was the president of Mena. JR Dodson owns the remaining interest in Mena, and at all relevant times, was the vice-president of Mena.

At one time, Hernan Lopez ("Lopez") was the part owner and general manager of an FAA-certified aircraft repair station in Florida. Lopez was also involved in acquiring aircraft seized by the Columbian and Mexican governments and arranging for the aircrafts' subsequent repair. He has

---

[1] As required by Fed. R. Civ. P. 52, the Court makes the following findings of fact and conclusions of law. Any findings of fact contained herein that could be deemed conclusions of law should be treated at such, and any conclusions of law that could be deemed findings of fact should likewise be treated as such.

[2] JR Dodson testified he was the president of DAI for a short period of time in 2002 while his father was on leave. He testified he has been the vice-president of DAI ever since.

owned multiple airplanes over the years, including Beech King Air Model 200 planes.  Lopez is also a pilot.

Sometime in 2006, PTC Aviation Corp. ("PTC"), a company wholly owned by Lopez, purchased a King Air, which had been confiscated by the Mexican government, and arranged for it to be imported into the United States.[3]  The King Air was "abandoned" at an airport in Mexico for approximately 5 years prior to the sale to PTC being fully completed.  It was in poor condition, did not have an Federal Aviation Administration ("FAA") issued Certificate of Airworthiness, and had incomplete maintenance records and logbooks.  Lopez intended to sell the plane after it was repaired.  At the time he purchased the King Air, Lopez estimated the repairs would cost $500,000 but understood the cost could be higher.

The United States Drug Enforcement Agency directed Lopez to have the King Air flown from Cancun, Mexico to the Bahamas, and then to Florida.  The King Air required a ferry permit from the FAA to be flown into the United States.

Lopez contacted several companies to gauge interest in renovating the King Air but most companies were unwilling to take on the project.  Lopez was acquainted with JR Dodson because Lopez had previously purchased parts from DIPI.  Lopez contacted JR Dodson about repairing the King Air because he knew DIPI offered competitive prices.  He also wanted to have the repairs completed under "one roof" and "insisted" on "centralized control" over the project.

On or about July 9, 2006, when the King Air was still in Florida, Lopez sent a letter to JR Dodson via email, requesting a quote for work to be done on the King Air.[4]  Lopez's letter requested

---

[3] Lopez also owned a company called Grulosa Inc.

[4] Ex. 91.

the quote include the following tasks: (1) inspecting the airplane as part of the process to obtain a new FAA Airworthiness Certificate; (2) repainting the plane (including removing the existing paint); (3) replacing the interior; (4) inspecting the plane's engines, with maintenance or overhaul as needed; (5) repairing fourteen known discrepancies;[5] and (6) significantly upgrading the plane's avionics systems, with the installation of new Garmin equipment, including a "TAWS card."[6] Although the July 9, 2006 letter was addressed to JR Dodson, Lopez did not know what company to whom he was sending the letter and did not care. Lopez asked JR Dodson to provide the destination where the King Air should be flown.

JR Dodson informed Lopez that DIPI could not perform the repairs. Instead, JR Dodson suggested to Lopez that DAI might be willing to perform the repairs with Mena handling the paint and interior, and referred Lopez to Bob Dodson. JR Dodson did not know if Bob Dodson was interested in repairing aircraft that was not owned by DAI or DIPI. JR Dodson could not authorize DAI to perform the work for Lopez without Bob Dodson's consent.

Bob Dodson and Lopez spoke by telephone about the repairs. Bob Dodson agreed DAI would handle the renovations on the King Air because JR Dodson said he owed Lopez a "favor." Bob Dodson gave a ballpark figure of $250,000 to perform an inspection, paint the plane, install a new interior, and upgrade the avionics. Bob Dodson provided the $250,000 quote to Lopez before seeing the King Air. The quote was a baseline figure and did not include the cost for additional repairs discovered during the inspection.

---

[5] A discrepancy or a "squawk" is something that might need to be repaired. Not all discrepancies are required to be repaired before an aircraft is returned to service. Only those discrepancies affecting a plane's airworthiness need to be repaired.

[6] "TAWS" stands for Terrain Awareness and Warning System. The TAWS system alerts pilots when their plane is flying within a specified altitude relative to the ground.

There was no written agreement governing the scope of the repairs or pricing for the work. Bob Dodson had no discussions with Lopez regarding hourly labor rates. JR Dodson, however, discussed hourly labor rates with Lopez. The Court finds JR Dodson's testimony to be the most credible about the hourly rates to be charged. The hourly rates to be charged were $50.00 per hour for work performed at Mena, $75.00 per hour for mechanical work, and $85.00 per hour for avionics work.

JR Dodson agreed to coordinate the repairs on the King Air after Bob Dodson determined DAI would complete the project for Lopez. JR Dodson told Lopez to have the King Air flown to Mena's facilities, and there is no persuasive testimony to the contrary. Lopez had the King Air delivered to Mena on or about July 17, 2006.

Robert Quillin was the manager of the Mena facility at all relevant times. At the time work on the plane was performed, Mena was not an FAA-authorized repair station, and Quillin was not an FAA-certified mechanic.

Robert Bowers, an Airframe and Power Plant ("A&P") mechanic licensed by the FAA, was DAI's director of maintenance and holds an FAA Inspector Authorization (IA). He supervised Mena's inspection and subsequent repairs on the plane and was in charge of signing off on the repairs performed at Mena. Bowers was responsible for making sure that all the work on the King Air was performed in accordance with the Federal Aviation Regulations ("FARs") and approve the King Air for return to service.

Bowers frequently communicated with personnel at Mena about the progress of the repairs. Quillen consulted Bowers about what work was to be performed on the King Air at Mena and how any discrepancies should be repaired as they were discovered. The Court finds Bowers' trial testimony about the extent of his involvement in supervising Mena's repairs of the King Air to be

credible.  Although JR Dodson was coordinating the project, he authorized Lopez to speak directly with Bowers and Quillin about the repairs.

When the King Air arrived at Mena, Lopez gave to Mena personnel a handwritten list of discrepancies.[7]  Lopez also discussed the list with JR Dodson.  As Mena mechanics inspected the King Air, they created handwritten sheets reflecting the discrepancies or repairs that were needed for the plane.[8]  For the majority of the discrepancies listed, the sheets also included the corrective action taken.  This included what repairs were completed, who completed them, when the repairs were completed, who approved the repairs, and the date returned to service.[9]  The discrepancy sheets were included in a Mena workbook.[10]  As confirmed at trial by Bowers, Mena corrected the discrepancies as reflected in the discrepancy sheets and logbooks.[11]

Lopez was informed about the discrepancies discovered by Mena and received progress reports about the repairs.[12]  Lopez monitored the repairs being performed at Mena.  He visited the Mena facility approximately five times to verify and observe the repairs being performed.  Lopez

---

[7] Ex. 66.

[8] Exs. 7–9, 12–17, 21–23, 25–29, 31, 33–40, 42, & 44–47.  The Court will refer to these exhibits collectively as the Mena discrepancy sheets.

[9] Not all discrepancy sheets contain the level of detail included in the Mena sheets.  In some cases, a discrepancy sheet merely lists an item that needs repair and does not describe the corrective action taken.

[10] Exs. 2–49.  The workbook consisted of the handwritten discrepancy sheets, some typewritten discrepancy sheets (Exs. 6, 30, 32, 41, 43) that summarize the discrepancies contained on the handwritten sheets, and some additional information, including 8130 forms and drawings of various repairs.

[11] Exs. 7–9, 12–17, 21–23, 25–29, 31, 33–40, 42, & 44–47.

[12] *See* Ex. 453 (Lopez explaining he receives progress reports from Mena).

was aware of the extent of the repairs being done to the plane.

Lopez was never provided with an estimate for any additional repairs or told any specific dollar figure that the additional repairs were going to cost. However, it was evident to Lopez that the original quote of $250,000 was going to increase based upon the additional discrepancies that were being discovered by Mena.

In early January 2007, while the King Air was still being repaired at Mena, Lopez was looking for a business partner to invest in the King Air. Lopez's discussions ended up focusing on a company called "Blackstone" and on Orlando Padron. Padron's primary business is his ownership of Multiphone, an international long distance company. Sometime in January 2007, Lopez met Padron in Miami, and at some point afterward, reached a handshake agreement for Padron to invest in the King Air. Essentially, Lopez would provide oversight of the King Air's renovation, and Padron would provide the money needed to complete the renovations, along with some additional funds needed by Lopez.

The basic monetary terms are reflected on Padron's handwritten notes of his meeting with Lopez.[13] According to the notes and explained by Padron at trial, Lopez indicated he had already spent $270,000 on the King Air, which included $80,000 he had paid towards the repairs by DAI. Lopez also said he needed $55,000 to pay off a lien on the King Air held by his former partners in PTC. He then itemized the amounts for certain repairs as follows: $40,000 for avionics upgrades; $40,000 for work on the engines, and approximately $70,000 for other work on the plane.

Padron instructed his attorney to prepare a formal agreement memorializing the relationship

---

[13] Ex. 595.

between Lopez and Padron.[14]  Among other things, the agreement reflects that: (a) Padron and Lopez

would become equal shareholders in a new company, HLMP; (b) Padron was loaning Lopez the

$55,000 needed to pay off the lien on the King Air held by Lopez's former partners in PTC; and (c)

Padron agreed to contribute the money needed to refurbish the King Air, which Lopez represented

to be $250,000.  The agreement was signed on February 9, 2007, and Lopez, acting on behalf of

PTC, executed a bill of sale for the King Air to HLMP on that same day.[15]  The King Air was not

registered in HLMP's name with the FAA contemporaneously with the signing of the agreement.

     The agreement between Lopez and Padron provides that Lopez would provide the expertise

and skill to refurbish the King Air to make it airworthy.  Thereafter, Lopez continued to be in charge

of the repairs to the King Air and communicate with JR Dodson about the repairs.  Lopez also sent

emails to JR Dodson expressing concern over how long the repairs were taking and complaining that

DAI was repairing other aircraft before the King Air.[16]  As reflected in those communications and

explained at trial, Lopez was getting pressure from Padron to have the repairs finished.

     At least some of the repairs at Mena were more complicated than originally anticipated.  For

example, the stripping of the paint from the King Air was substantially more labor intensive than

expected because the undercoat had been painted in red oxide, an automotive product, which is not

---

[14] Ex. 435.

[15] Ex. 432.

[16] Exs. 443, 445 & 461.  In early January 2007 when Lopez was seeking an investor, but
before the agreement with Padron was finalized, Lopez inquired as to the status of the repairs to
the King Air and requested the project be completed as expeditiously as possible without
sacrificing quality; he also commented that the project was taking too long. Exs. 425 & 431.  At
trial, he explained he was frustrated that repairs to other planes had taken priority over his plane.
Specifically, he mentioned that the plane had been removed from the paint shop a few times,
which caused delays.

intended to be used on aircraft.  At least three attempts to chemically remove the paint were made before Mena mechanics hand-sanded the paint from the exterior of the King Air.  Lopez testified he had not anticipated the King Air would need to be hand-sanded, but authorized the extra work involved.

Mena mechanics also discovered an illegal repair to a wing of the King Air.  The wing had to be removed and completely re-skinned.[17]  During this process, it was also discovered that there was a hole in the spar cap that needed to be repaired.  The spar supports the wing, and thus affects the structural integrity of the wing.  These repairs were extremely labor intensive.  Bowers assisted Mena personnel in developing drawings and instructions for the proposed repair to the spar.  Bowers approved the drawings and instructions, which were then submitted to and approved by an FAA Designated Engineering Representative ("DER").  Bowers later inspected and approved Mena's repair of the spar cap.

In June 2007, Lopez requested JR Dodson or Bob Dobson provide him with an update on the repairs and inquired, "Where do we stand as far as numbers to avoid surprises at the end?"[18]

On or about July 23, 2007, Quillin provided Lopez with an invoice in the amount of $159,795.23.[19]  Although labeled an "invoice," it was intended to be a progress report, and Quillin did not expect Lopez to pay Mena directly for the invoice.  Lopez never paid Mena for the invoice.  The invoice included services, parts, supplies and materials used or provided between July 17, 2006

---

[17] Exs. 22 & 85.  For major repairs and alterations to a plane, the person performing the work must complete a "337 form" and submit the completed form to the FAA.  14 C.F.R. § 43.9(d).  It is undisputed that a "337" form for the re-skinning of the wing was not completed.

[18] Ex. 453.

[19] Ex. 54.

and July 10, 2007.  The labor rate charged by Mena was $50.00 per hour.  Lopez did not complain or express any dissatisfaction with the invoice.

Sometime in the summer of 2007, DAI contracted with an entity in Hot Springs, Arkansas called Pro Turbine, Inc. ("Pro Turbine") to conduct a "hot section inspection."  A hot section inspection is essentially a comprehensive inspection of the plane's two engines.

In mid-August 2007, the King Air was taken to DAI's facility in Ottawa, Kansas for the avionics work.

At various times, Lopez represented to Padron that the repairs to the King Air would cost approximately $250,000.  Lopez never informed Padron that the cost to repair the King Air had increased.  Lopez never sent the Mena progress reports to Padron.  By the end of 2007, Lopez and Padron's business relationship had deteriorated.  On or about December 20, 2007, Padron registered the King Air with the FAA in HLMP's name.[20]

On or about December 31, 2007, Quillin provided another invoice to Lopez as a progress report.[21]  This invoice contained labor, parts, materials, and supplies utilized in the repair of the plane between July 11, 2007 and December 28, 2007.  The labor rate charged was $50.00 per hour.  The total amount of this invoice was $47,554.51.  Lopez did not challenge the amount due or otherwise complain about the invoice.  Lopez never paid Mena for the invoice.

In late January 2008, Lopez informed personnel at DAI and/or DIPI that Padron was a partner of Lopez on the King Air.  Lopez authorized DAI to answer any questions by Padron and his agents and to make the King Air and its records available for inspection.

---

[20] Ex. 490.

[21] Ex. 58.

On February 8, 2008 as the repairs were nearing completion, Mary Snyder, JR Dodson's administrative assistant and employee of DIPI sent Lopez a recap of the charges incurred to date.[22] The recap was for $315,957.18 after crediting Lopez with over $112,000 in advance payments.

The next day, Lopez sent an email to DAI in which he stated he was trying to understand the bill and wanted to sit down with more papers so he could understand every aspect of the invoice.[23] In that email, Lopez did not express any dissatisfaction with the amount of the bill.  Lopez testified he did not have any complaints about the charges, but still thought he might be able to get a better deal.  He also testified he was concerned about whether all of his advance payments had been credited.  More specifically, he was concerned that there should have been another $20,000 or $30,000 credit on the recap.

Although he did not have an exact figure, Lopez understood the repairs to the King Air would cost more than the original estimate $250,000.  This is confirmed by the status reports and invoices he was receiving from DIPI, DAI, and Mena.  On or about July 23, 2007, Lopez knew Mena had incurred charges and parts totaling $159,795.23.[24]  Lopez also had been sent an invoice for the propellers in the amount of $54,000.[25]  On or about August 30, 2007, DAI issued an invoice to Lopez for the hot section inspection in the amount of $40,280.46.[26]  Thus, by the end of August 2007, Lopez knew the repairs had already totaled at least $254,075.69.  This amount did not include

---

[22] Ex. 502.

[23] Ex. 503.

[24] Ex. 54.

[25] Ex. 51.

[26] Ex. 467.

11

any charges for the avionics work yet to be performed by DAI.[27]

Sometime in February 2008, Mena personnel traveled to DAI's facility in Ottawa to paint stripes on the plane and complete work on the interior.

On or about February 14, 2008, the King Air was determined to be airworthy and was issued a Certificate of Airworthiness by a designated representative of the FAA.[28]

On February 18, 2008, Snyder assembled supporting documentation to provide to Lopez and Padron and Padron's agents.  She also prepared a recap of the charges for work performed on the King Air.[29]  The recap reflected charges for labor and parts supplied by DAI, parts supplied by DIPI, labor provided by Mena, and other items paid direct to vendors by DAI.   The amount of the invoice was $390,752.26.  Lopez testified he had no complaints about the amount of the invoice.

On or about February 22, 2008, Padron and his advisor, Javier Jorda, personally met with JR Dodson in Kansas.

On or about February 26, 2008, Mena forwarded an updated invoice to Snyder, to be included in the final invoice she was preparing; Lopez received a copy of the Mena invoice.[30]   It reflected an  additional amount of $13,712.73.  Lopez did not express any dissatisfaction with the invoice.  Lopez never paid Mena for the invoice.

On March 17, 2008, JR Dodson sent a letter to Lopez and HLMP on DAI letterhead indicating  the  work-scope  ordered  by  Lopez  was  complete  and  attaching  an  invoice  for

---

[27] The King Air was not taken to DAI's facilities until August 2007.

[28] Ex. 509.

[29] Ex. 511.

[30] Ex. 58.

$390,752.26.[31]  JR Dodson indicated he understood the ownership of the King Air might have changed during the course of the work and requested a release from Lopez prior to DAI releasing the aircraft to HLMP.  JR Dodson explained he did not want to become embroiled in any issues between Lopez and HLMP.

On March 18, 2008, HLMP and Padron filed a lawsuit against Lopez and others in the Circuit Court of Dade County, Florida and obtained from that court an *ex parte* temporary injunction requiring that DIPI and/or DAI surrender possession of the King Air.  The injunction was registered in Franklin County, Kansas on March 19, 2008,[32] and the King Air was seized later that day by the Franklin County Sheriff.   Padron was physically present when the Franklin County Sheriff seized the King Air.

HLMP did not pay the repair bill prior to the King Air being seized.[33]  DAI did not authorize the release of the King Air the day it was seized.

Lopez advanced a total of $131,102.46 for the repairs to be performed on the King Air.  As reflected in his testimony, Lopez authorized all of the repairs done to the King Air, was satisfied with the quality of the repairs, had no objections to the $390,752.26 that had been billed, and believed $390,752.26 was reasonable for the repairs performed after crediting his advance

---

[31] Ex. 527.

[32] The Kansas Supreme Court later ruled that the Florida injunction was not properly subject to registration in Kansas under the Uniform Enforcement of Foreign Judgments Act. *Padron v. Lopez*, 289 Kan. 1089, 220 P.3d 345 (2009).

[33] The circumstances surrounding the seizure of the plane are subject to a separate lawsuit in this District.  *Dodson Aviation, Inc. v. Padron, et al.*, Case No. 10-4036.

payments.[34]

On March 19, 2008, DAI filed a lien pursuant to K.S.A. 58-201 and 58-202 with the Register of Deeds in Franklin County, Kansas.  On May 13, 2008, DAI filed a second amended lien, which reflected a balance due of $484,894.50.[35]  As stipulated by the parties, "The lien has been properly filed and its validity is not contested, though the amount of plaintiff's lien is contested."[36]

## A.    DAI's Lien Extends to the Mena Labor and Parts Supplied by DIPI

The first issue presented to the Court is the scope of the lien filed by DAI.  HLMP contends Lopez entered into separate contracts with DAI, Mena and DIPI for their respective contributions toward the King Air's renovation.  This is a critical issue because, as will be explained in the Court's conclusions of law, a lien was filed against the King Air only by DAI, and DAI may not subsume within its lien the contributions of DIPI and Mena unless they were legally DAI's subcontractors.

A contractor is "one who furnishes labor or materials under a contract direct with the owner for the improvement of property."[37]  A subcontractor is "one who assumes a portion of a contract from the original contractor or another subcontractor for the performance of all or part of the services or work which the other has obligated himself to perform under contract with the owner."[38]

---

[34] Lopez testified he did not see the final figure of $484,894.50, but he understood there would be additional charges added to the $390,752.26 invoice.  At trial, HLMP introduced evidence of a letter from Lopez's attorney in which his attorney comments that Lopez believed the charges to be excessive.  Although the Court allowed the letter to be introduced, the Court does not lend any weight to the statements made by Lopez's attorney after considering Lopez's trial testimony and the other evidence in this case.

[35] Ex. 95.

[36] Pretrial Order at 2, ECF No. 125.

[37] *Stewart v. Cunningham*, 548 P.2d 740, 743 (Kan. 1976).

[38] *Id.*

The critical fact making one a contractor is his or her relationship to the owner of the property.[39]

A contractor has a contract directly with the owner.[40]  A subcontractor, on the other hand, does not

have a separate contract with the owner of the property and is not a direct creditor of the owner.[41]

The determination of whether an individual or entity is a contractor or subcontractor is a

question of fact under most circumstances.[42]  The controlling question as to whether a binding

contract was entered into depends on the intention of the parties.[43]

Under Kansas law, in determining intent to form a contract, the test is objective, rather than

subjective.[44]  The relevant inquiry is the manifestation of a party's intent.  Put another way, the

inquiry focuses on whether the parties' outward expression of assent is sufficient to form a contract

not whether the subjective minds of the parties have met.[45]  The Court will focus on the "outward

expressions" of contractual assent.[46]  Factors the Court could consider include how and by whom

DIPI and Mena were contacted to perform work on the King Air; how DIPI and Mena were made

aware of the scope of the repairs to be performed; whether there was an agreement between DAI,

---

[39] *Alliance Steel, Inc. v. Piland*, 187 P.3d 111, 119 (Kan. Ct. App. 2008).

[40] *Id.*

[41] *See id.*; *Toler v. Satterthwaite*, 434 P.2d 814, 817–18 (Kan. 1967) (superceded on other grounds).

[42] *See Stewart*, 458 P.2d at 743; *Alliance Steel*, 187 P.3d at 117–19. Courts from other jurisdictions also have held that the determination of whether an individual or entity is acting as a contractor or subcontractor is a question of fact.  *Taylor v. King*, 994 A.2d 330, 340 n.11 (Conn. App. Ct. 2010).

[43] *Sidwell Oil & Gas Co. v. Loyd*, 630 P.2d 1107, 1112 (Kan. 1981).

[44] *Sw. & Assocs., Inc. v. Steven Enters., LLC*, 88 P.3d 1246, 1249 (Kan. Ct. App. 2004).

[45] *Id.*

[46] *See id.*

15

DIPI and Mena that DAI would be liable for payment for their services; with whom Lopez discussed the progress of the repairs; and how billing and payment were handled.[47]

The Court's task in resolving this issue is difficult because there was no written contract between Lopez and DAI or between DAI and DIPI and/or Mena. The extent of the initial written communication was an email from Lopez to JR Dodson seeking a quote for the work to be performed on the King Air; however, Lopez did not address his letter to any specific company and did not otherwise indicate in his email which company he was seeking to hire. Additionally, because JR Dodson held positions with DAI, DIPI, and Mena, and Bob Dodson held positions with DAI and Mena, it is not always clear which entity they were representing in their interactions with Lopez.

For the following reasons, the Court finds Mena was a subcontractor of DAI.

Lopez testified he wanted the project handled under "one roof" and centralized control. This supports Lopez did not enter into separate contracts with more than one entity. JR Dodson suggested to Lopez that DAI could perform the repairs with Mena handling the paint and interior and referred Lopez to Bob Dodson. Bob Dodson agreed DAI would perform the repairs. JR Dodson then coordinated the repairs on the King Air. In his July 9, 2006 letter, Lopez asked JR Dodson to provide the destination where the King Air should be flown. JR Dodson told Lopez to have the King Air flown to Mena.

Bowers, DAI's director of maintenance, supervised Mena's inspection of the King Air and subsequent repairs. He was responsible for making sure all of work on the King Air was performed in accordance with the FARs and approving the King Air for return to service.

---

[47] *See id.*

Bowers frequently communicated with personnel at Mena about the progress of the repairs. Quillin consulted Bowers about what work was to be performed on the King Air at Mena and how the repairs should be completed.  For example, Bowers was involved in designing, inspecting, and approving Mena's repair to the spar.  The fact that a DAI employee was responsible for approving the repairs done at Mena strongly supports that Mena was subcontractor of DAI.  Additionally, DAI provided Mena with the hourly rate that Mena was to charge for the project.

Although Robert Quillin sent three documents labeled "invoices" to Lopez, these invoices were sent to Lopez to keep him apprised of the project.  Quillin did not expect or intend that Lopez would pay Mena directly for the charges listed on these invoices.  Lopez never paid Mena for any of these invoices.

JR Dodson's assistant, Snyder, prepared a "recap" of the parts and labor due on the King Air. The recap included amounts due for services and/or parts provided by Mena, DIPI, and DAI.  The amounts on the Mena invoices that had been previously sent to Lopez by Quillin appeared on the recap generated by Snyder.  On March 17, 2008, JR Dodson sent an invoice on DAI letterhead to Lopez and HLMP for $390,752.26, which corresponded to the recap prepared by Snyder.[48] The fact that DAI sent one invoice containing the charges for DIPI, DAI, and Mena supports that Mena did not have a separate contractual relationship with Lopez.

Although a closer call, the Court also finds DIPI was a subcontractor of DAI.

Lopez did not draw a distinction between the various Dodson companies.  Although the July 9, 2006 letter was addressed to JR Dodson, Lopez did not know what company to whom he was

---

[48] Ex. 527.

sending the letter and he did not care.  The Court finds Lopez's testimony that he wanted the project done under one "roof" and have centralized control to be the most persuasive evidence on this issue.

This is also evidenced by how the project originated.  Lopez did not discuss buying parts from DIPI with JR Dodson, and then discuss the repairs to be performed with DAI.  Rather, when Lopez contacted JR Dodson, JR Dodson told him DIPI could not perform the repairs and referred him to Bob Dodson at DAI.  It was only after Bob Dodson agreed DAI would perform the repairs that JR Dodson became involved in the project.

As discussed above, on March 17, 2008, JR Dodson sent an invoice on DAI letterhead to Lopez and HLMP for $390,752.26, which included DIPI's charges for the parts supplied on the King Air.[49]  The fact that DAI sent one invoice containing the charges incurred by DIPI supports that DIPI did not have a separate contractual relationship with Lopez.

HLMP focuses on the fact that Snyder, a DIPI employee prepared the recap of charges and final invoice.  Snyder prepared the recap at JR Dodson's request, who was coordinating the project.  Although vice-president of DAI, JR Dodson's physical office was located at DIPI in Rantoul, and Snyder was his administrative assistant.  Snyder sometimes performed work for DAI if requested to do so by JR Dodson.  Snyder previously worked for DAI, but was paid by DIPI.  Thus, the Court does not lend much weight, if any, to the fact that an employee of DIPI prepared the recaps, and finds the recaps and final invoice were prepared for and sent by DAI.[50]

HLMP also emphasizes that the final invoice sent by DAI directed payment be sent to DIPI and that DIPI received advance payments directly from Lopez on other occasions.  It is difficult for

[49] Ex. 527.

[50] Although the recaps sent to Lopez by Snyder reflected DIPI letterhead, the final invoice sent by JR Dodson on March 17, 2008 was sent on DAI letterhead.

the Court to draw any conclusions based upon how the advance payments made by Lopez were handled.  DIPI  received payment for DAI invoices on at least one other occasion.  For example, DIPI received the credit card payment for DAI's invoice for the hot section inspection.[51]  Lopez also sent a $30,000 advance payment directly to DAI.[52]

In the final invoice, Lopez's advance payments were not applied to any particular entity, and simply appeared as a lump sum credit at the end of the bill.  For example, although Lopez wired approximately $60,000 to DIPI, this amount was not specifically applied to DIPI's parts charges on the final invoice.  After receiving the recap of charges, Lopez questioned whether he had actually sent $50,000 to DAI, instead of $30,000.  Snyder followed up with Lopez to ensure that he received credit for the amount he sent to DAI.  This supports that the parties did not subscribe any particular significance to which entity had received the advance payments.

It is also true that DAI ordered parts from DIPI to be used on the King Air, at other times Mena ordered parts to be used on the King Air, and at other times, Lopez himself directly ordered parts from DIPI for the plane.  For example, Lopez ordered from DIPI the propellers that were installed on the King Air, at a cost of $54,000.[53]  Lopez did not pay for the propellers at that time. Rather, the charge for the propellers was included on the final invoice sent by DAI.

---

[51] Ex. 520.

[52] Ex. 507 (indicating DIPI received $30,000 from DAI in July 2006); Ex. 520.

[53] Ex. 51.  The King Air had three bladed propellers when it was delivered to Mena. During its inspection or repairs, Mena discovered corrosion on the propellers.  The propellers were too thin to be overhauled. JR Dodson gave Lopez the option to purchase a new three bladed propellers or upgrade to four bladed propellers.  Lopez then chose to order the four bladed propellers. The propellers were sent to DAI, not Lopez. Ex. 51.

DIPI sent invoices for the parts as they were ordered.  Some reflect that Mena was billed,[54] but many reflect the invoice was sent to Grulosa Inc., a company owned by Lopez.[55] With the exception of the invoice for the "Hot Section," Lopez did not pay the invoices as they were sent to him at Grulosa Inc.  Rather, the amounts on the invoices sent to Grulosa Inc. were later included in the recap and final invoice prepared by Snyder.[56]  Similar to the invoices sent to Lopez from Mena, this fact supports that the bills were sent to Lopez to keep him informed on the status of the project. DAI's 30(b)(6) deponent confirmed that Lopez was sent interim billings from Mena and DIPI to keep Lopez up to date so he would not be surprised at the end of the project.

The fact that Lopez did not pay these invoices as they were generated also supports that he expected to receive one invoice at the end of the project containing all charges incurred regardless of the entity performing the repairs or providing the part.  Considering Lopez's testimony that he wanted the repairs under one roof, it is not plausible Lopez had a separate contract with DIPI for certain parts and had a separate contract with DAI, which included other parts supplied by DIPI for the same project.

---

[54] Exs. 53 & 62.

[55] Ex. 51.  The Court can find no way to distinguish why DIPI sent the invoices to Lopez for some parts, Mena for some parts, and DAI for others.  Although the invoice for the propellers appears to have been sent to Lopez because he decided to order new propellers for the plane, many of the invoices sent to Lopez were for relatively inexpensive parts, such as a $10.00 switch assembly.  The Court does not find it plausible Lopez ordered such inexpensive parts directly from DIPI.  Indeed, Lopez testified he never spoke with the sales people listed on the invoices.

[56] The Court also makes little of the fact that the invoices were directed to Grulosa Inc. rather than PTC or later, HLMP.  For example, similarly, CR Aviation sent its invoice to Multiphone Latin America, Inc., another company owned by Padron (Ex. 538), but HLMP indicates it was responsible for the invoice.

The manner in which the repairs for the King Air were billed and payment handled is best explained by the fact that DAI did not typically perform repairs for third parties and was unaccustomed to billing third parties for such repairs.

### B.     Fair and Reasonable Value of Parts and Services Provided by Mena

As will be discussed in the Court's conclusions of law, the discrepancy sheets contained in the Mena workbook do not constitute a maintenance record within the meaning of 14 C.F.R. § 43.9 if there was no corresponding cross-reference in the King Air's logbook.  The parties strongly dispute what value, if any, the repairs described in Mena's discrepancy sheets are worth.

HLMP's expert, Frank Evanega, testified any repairs not described in the King Air's logbooks should not be considered in calculating the reasonable value of DAI's services because the repairs would need to be re-done.  Thus, Evanega did not include any repairs reflected in the Mena discrepancy sheets when calculating his estimates for the length of time needed to perform the repairs.[57]  For example, Evanega gave no credit for the re-skinning of the wing or many other items reflected in the Mena discrepancy sheets even though the evidence at trial, including the testimony of Bowers, demonstrated such work was performed.[58]

DAI's expert Kenith Hibler is a former employee of the FAA, a former FAA instructor, and holds an A&P mechanic certificate with Inspection Authorization.  He testified he has never ordered work re-done simply because it was not properly documented in a logbook or 337 form.[59]  He

---

[57] Exs. 2–49.

[58] *See* Ex. 85 (photos of King Air as repairs were being made).

[59] Although Bowers testified that Mena and/or DAI had to re-do repairs that they could not verify, there is nothing showing the repairs redone by DAI had any documentation, let alone documentation as detailed as the Mena discrepancy sheets.  The Court does not find this testimony to be particularly probative on this issue.

explained there would be no need to have the work re-done because the paperwork could be corrected. The Court finds Hibler's testimony to be more persuasive on this issue. Other evidence also supports DAI's position.

For example, Hibler testified that at least some of the Mena discrepancy sheets contained all of the information that is required to be entered in the maintenance record pursuant to 14 C.F.R. § 43.9.[60] For example, discrepancy #47 described the issue with the skinning of the wing, the corrective action taken, when it was corrected, who corrected it, who approved the repair, and his certificate number as required by 14 C.F.R. § 43.9.[61] There are also 8130 forms, which approve that a part has been returned to service, behind many of the discrepancy sheets.[62] The majority of the repairs performed by Mena are well documented. The Court does not find it credible that repairs described in the Mena discrepancy sheets (containing the information required by 14 C.F.R. § 43.9) would need to be re-done solely because there was no corresponding reference in the logbook. This might violate the FARs, but it does not necessarily follow that the repairs had no value and had to be re-done.

Further, on or about February 14, 2008, the King Air was determined to be airworthy and was issued a Certificate of Airworthiness by a designated representative of the FAA.[63] Although

---

[60] Pursuant to 14 C.F.R. § 43.9, mechanics working on aircraft must make a separate entry in the plane's "maintenance record" containing (a) a description of the work performed, (b) the date the work was completed, (c) the name of the person performing the work (unless it is the same person making the entry in the record), and (d) if the work performed on the aircraft has been performed satisfactorily, the signature, certificate number, and kind of certificate held by the person approving the work.

[61] *See* Ex. 22.

[62] *See* Ex. 17.

[63] Ex. 509.

it is not clear that the FAA representative reviewed the Mena workbook, it was made available to him, and he conducted a physical inspection of the entire King Air, which would have included, for example, the wing.  After such inspection, he determined the King Air to be airworthy.  There is no evidence HLMP has obtained a new Certificate of Airworthiness or was required to do so after it took possession of the plane.

When the King Air was returned to Florida, it was inspected by personnel at CR Aviation, an FAA-certified repair station near Miami. CR Aviation completed a Phase 1 through 4 inspection of the King Air and developed a list of discrepancies.[64]  The items found needing repair are subject to a claim by HLMP for offset in the amount of $26,227.59, as discussed in more detail below. There is no evidence that CR Aviation repaired any other items or determined that the repairs documented in the Mena discrepancy sheets needed to be re-done simply because they were not referenced in the logbooks.  As a result, in determining the value of the services provided by Mena, the Court will consider the repairs described in the Mena discrepancy sheets.

The Court now turns to the value of the repairs performed by Mena.   Bowers was responsible for making sure all of work on the King Air was performed in accordance with the FARs and approving the King Air for return to service.  Bowers confirmed that Mena performed the repairs described in the Mena discrepancy sheets and logbooks.   HLMP's did not challenge that the work described in Mena's discrepancy sheets was actually performed, and for the most part, did not criticize the quality of the work done.

---

[64] Ex. 596.

The time sheets kept by Mena form an accurate basis for determining the hours spent by Mena personnel in repairing the King Air.[65]

The Court finds the rate of $50.00 per hour charged by Mena to be fair and reasonable. JR Dodson testified he and Lopez discussed that Mena would charge $50.00 per hour.[66]  Mena's rate of $50.00 per hour was $20.00 below what Mena normally charged.  DAI's expert, Sammy Bereznak, testified $50.00 was fair and reasonable and, for the turbine repairs being done by Mena, was lower than the industry standard at that time.[67]  Gene Trull, a service supervisor at Hawker Beechcraft Services, testified that  the hourly rate to perform a complete inspection was $95.00 per hour and that the paint shop rates at his facility were approximately $60.00–$70.00 per hour.  Defendant presented no testimony challenging the reasonableness of Mena's hourly rate.

Both parties presented expert testimony regarding the reasonableness of the work performed by Mena.  The Court finds DAI's expert's testimony to be more persuasive than the testimony of HLMP's expert.

DAI's expert, Sammy Bereznak, is a 30 year owner and operator of an FAA-certified repair station.  He has a number of ratings from the FAA.  He has personally been involved in a number of repairs of King Airs, and other aircraft, that have been on a Mexican registry.  He specializes in

---

[65] *See* Ex. 59.

[66] Although Lopez testified to a lower hourly rate to be charged by Mena, he also testified he could not specifically recall the figure.  Other evidence supports JR Dodson's testimony.  For example, the status reports sent by Mena reflected an hourly rate of $50.00.  After receiving the invoices, Lopez did not complain about or contest the $50.00 hourly rate.  This indicates the $50.00 hourly rate was the rate discussed with Lopez.  Lopez also testified he understood that $50.00 per hour was below the industry standard rate.

[67] The testimony that the $50.00 hourly rate was below market value was limited to the repairs for turbine work.

the repair of damaged aircraft.  Bereznak has extensive experience with the number of hours, labor charges, parts, materials and supply costs for repairs to aircraft, including King Airs.

Bereznak testified that the price charged for the services rendered, including those incurred by Mena, are fair and reasonable.   Lopez testified he had no complaints about the labor hours incurred.  Lopez also believed the invoice in the amount of $390,752.26 was reasonable.  The Court finds the charges incurred by Mena are fair and reasonable.

HLMP's expert, Frank Evanega, has never performed a refurbishment on a King Air purchased from Mexico.  At least some of the witnesses that Evanega consulted, such as Gene Trull, did not view the King Air, did not have records from the King Air, and did not know the condition of the King Air.

The hourly estimate for the length of time taken to strip and paint the King Air as calculated by Evanega was based upon the Beech factory estimate of minimum work.  He did not know or consider that red oxide paint was used on the King Air and the fact that the King Air was chemically stripped three times prior to having the paint hand sanded from the King Air.  Evanega admitted it would take a lot of extra labor to hand-sand the plane.

The hourly estimates for the length of time taken to perform interior work on the King Air, as calculated by Evanega, were based upon the Beech factory estimates of minimum cabinet work and factory basic interior.  He did not consider that the interior was reconfigured as requested by Lopez and that custom features were requested by Lopez.

There were, however, some issues with Mena's documentation of the repairs to the King Air.  For example, there is no dispute the King Air required a complete "Phase 1 through 4" inspection.  Aircraft that are in normal operations undergo a cycle of inspections, spaced out in four phases. For

planes such as the one involved in this case, where there is no evidence of a cycle of inspections having been done for several years, all four phases of the inspection process must be done at once, i.e., the King Air was required to undergo a "complete inspection."

Logbook entries made by Mena personnel merely state that a complete inspection was performed.  However, the inspection process is required to be documented by a manufacturer prescribed checklist, in which the inspector checks off every item on the list as it is inspected. The completed checklist is then to be given to the plane's owner, and included in the plane's maintenance record, at least until the next round of inspections is completed.[68]

There is no evidence that Mena or DAI actually followed that checklist, because (a) DAI did not introduce testimony from the Mena employee who allegedly conducted the inspection, (b) Mena's manager, Quillin, does not recall ever seeing a completed checklist, and (c) DAI did not introduce anything purporting to be the completed checklist.  It was thus reasonable for HLMP to pay for an inspection of the King Air after it took possession of the King Air, and the Court will credit HLMP the $2,000.00 incurred for this inspection.[69]

### C.      Fair and Reasonable Value of Parts and Services Provided by DAI

JR Dodson and Lopez discussed that DAI's rates would be $75.00 per hour for mechanical work and $85.00 per hour for avionics work.  The rate of $75.00 per hour was the same rate that DAI charged DIPI, but $10.00 less than DAI's "off the street" charge.  HLMP's expert testified that Raytheon Aircraft Service charged $75.00 for mechanics.  CR Aviation, an FAA-certified repair

---

[68] 14 C.F.R. § 91.417.

[69] Ex. 538.

station near Miami that performed additional repairs on the King Air, charged $85.00 per hour.[70] Bereznak testified the labor rate at his shop was $85.00 per hour for all work.

The rate of $85.00 per hour for avionics work was $10.00 below what DAI normally charged. Lopez testified that in his experience, the normal hourly rate for avionics was between $80.00–$90.00 per hour. HLMP's expert testified Raytheon Aircraft Service charged $85.00 for avionics.

Accordingly, the Court finds DAI's hourly rates to be fair and reasonable.

The Court cannot substantiate some of the hours DAI personnel spent repairing the King Air. Exhibit 55 was a summary created by DAI reflecting DAI's charges for parts and labor. It includes a charge of $42,750 for labor allegedly performed by "Don" and "Randy." The document bears a handwritten date of "1/21/2008." Another copy of the document is included in Exhibit 502, reflecting it was faxed on 1/29/2008. Thus, the document was prepared at least by January 29, 2008.

However, the last two pages of Ex. 55 (designated as Exhibit 55(A) at trial) purport to record time for work done by Don and Randy in February and March 2008, so those time entries could not be those summarized on the first page of Ex. 55. Moreover, DAI's other time sheets at Exhibit 64 do not include any time sheets for "Don" or "Randy" predating February 2008. DAI has not produced any time sheets supporting the hours claimed. Snyder, who prepared the recap, did not review any time sheets that substantiated these hours. The Court finds DAI has not sufficiently established these hours were actually incurred in repairing the King Air, and will deduct $42,750 from the invoice.

---

[70] Ex. 538.

On the final invoice sent to Lopez and HLMP, there is a charge of $40,280.46 for Pro Turbine.[71]  As discussed above, Pro Turbine performed a hot section inspection and invoiced DAI $21,497.88 for that work, which included FedEx and other administrative charges.[72]  On or about August 30, 2007, DAI issued its own invoice to Lopez for the hot section inspection.[73]  DAI's invoice doubled virtually every line item on the Pro Turbine invoice, including the FedEx charges, and amounted to $40,280.46.  The invoice was paid by credit card, which resulted in a fee of $822.00.[74]  Credit for a payment of $41,102.46 was reflected on the final summary of charges.[75]  No credible explanation was provided as to why the invoice from DAI was nearly double the invoice from Pro Turbine.  The Court finds the reasonable value of the services performed by Pro Turbine to be $21,497.88.  Accordingly, the Court will deduct $18,782.58 from the final invoice.  The Court will also deduct the credit card fee of $822.00 because the Court cannot determine whether this fee would have been the same for a $21,497.88 invoice.

The Court finds the remaining labor charges by DAI to be fair and reasonable. As discussed above, Bereznak testified that the price charged for the services rendered, including those incurred by DAI, are fair and reasonable.  Lopez testified he reviewed the labor performed and had no

---

[71] Ex. 527.

[72] Ex. 468.

[73] Ex. 467.

[74] Ex. 520.

[75] Ex. 1.  On February 8, 2008, Lopez received a recap of the charges incurred for repairing the King Air, which included a credit of $22,319.88 for Pro Turbine.  Ex. 502.  This corresponds to the amount of the invoice from Pro Turbine, plus an $822.00 credit card fee.  On February 18, 2008, Snyder sent another invoice recap.  Ex. 511.  This recap reflected a credit of $41,102.46 for the Pro Turbine invoice and credit card fee.

complaints about the labor hours incurred.  Lopez also believed the invoice in the amount of $390,752.26 was reasonable.  Defendant presented no evidence that the rates actually charged by DAI were unreasonable.

### D.    Fair and Reasonable Value of Parts Supplied by DIPI

HLMP does not dispute the majority of the charges being requested for parts used on the King Air.  HLMP, however, challenges $26,057.84 in DIPI parts charges.  Evanega disregarded parts purchased and installed and work performed on the King Air that are described in the Mena discrepancy sheets[76] but were not also fully set forth in one of the King Air's logbooks.  Evanega did not contend the parts were not utilized.  As discussed above, the Court finds DAI should be compensated for the work described in the Mena workbook.  The Court will not deduct an amount from the invoice merely because the repairs involving these parts were not described in the logbook.

The parts are documented in invoices sent to Lopez and Mena.[77]  The discrepancy sheets also document that repairs were made using these parts.  For example, there is a $2,500 charge for a cabin door assembly.[78]  Although there is no logbook entry reflecting work done on the King Air's doors, there are discrepancy sheets indicating that repairs were made to a door.[79]  The entries describe the discrepancies, how they were repaired, when they were repaired, who inspected the repairs, and the date, among other information.  As another example, HLMP contended it should not be charged for a fuel cap assembly in the amount of $288.04 because there was no logbook entry.

---

[76] Exs. 2–49.

[77] Exs. 51 & 53.

[78] Ex. 62.

[79] Ex. 23 at AA02402.

However, a discrepancy sheet indicates Mena repaired a fuel cap.[80]  Additionally, HLMP contended

it should not be charged for a starter generator in the amount of $3,425.65 because there was no

logbook entry for this starter generator.  A Mena discrepancy sheet indicates a starter generator was

installed.[81]

The Court finds the parts for which DIPI is seeking payment were installed on the King Air.

Plaintiff's expert testified DIPI's parts charges were fair and reasonable.  He testified that in many

instances, the prices charged by DIPI, such as $6,500 for a rudder assembly, were below market

value.  The Court finds the prices charged for the parts are fair and reasonable.

However, there are duplicate charges for two items.  There is a duplicate charge of $500.15

for altimeters.[82]  Evanega also identified a duplicate  charge in the amount of $1,250 for engineering

approvals.  Plaintiff has not contested these are duplicate charges or otherwise offered any evidence

to the contrary.  The Court will credit DAI's invoice for these charges.

**E.      Garmin 530/TAWS Unit**

Lopez requested the installation of new Garmin equipment, including a "TAWS card."

There is no dispute that the TAWS software was an essential piece of equipment required for the

King Air to be airworthy.  A new TAWS unit was included in DAI's invoice for parts,[83] and its

---

[80] Ex. 14.

[81] Ex. 33.  Defendant also seeks a credit for a different starter generator because there was
no documentation describing how many hours it had been in service since it had been
overhauled.  This will be discussed in section F below.

[82] *See* Exs. 55 and 57 (reflecting that Mena and DAI both charged $500.15).

[83] Ex. 55.

$16,100 charge is included in the final invoice as part of the $58,656.05 charge for "Dodson Aviation Avionics Parts & Services."

On March 19, 2008, the day the plane was seized, the Garmin 530/TAWS unit was not in the King Air. HLMP rented a new TAWS unit in order to fly the King Air back to Florida, and then purchased a new TAWS, for a total price of $19,498.02.

Although HLMP contended that DAI personnel removed the Garmin 530/TAWS Unit from the King Air after it was seized by the Franklin County Sheriff, there is no persuasive testimony establishing this point. Moreover, the Court does not believe this is a particularly important. Regardless of why, the fact remains that the Garmin 530/TAWS unit was not in the King Air, nor has it been provided to HLMP. The Court will credit the invoice for $16,100, the amount DAI had charged for the Garmin 530/TAWS unit.

### F.    Starter Generator

DAI installed two starter generators on the King Air. The starter generator is an important safety-related part, because it charges the plane's batteries while the plane is in flight; the batteries in turn power the plane's avionics.

There was no indication from any documents associated with one of the starter generators as to how many hours it had been in service since it had been overhauled, even though the King Air's maintenance manual recommends that starter generators be overhauled every 1,000 hours. Because starter generators are recommended for overhaul or replacement after 1,000 hours of use, and given their critical role in maintaining power to the plane's instruments, it is not reasonable for HLMP to be required to pay for this part where its prior history was not documented in any way.

Therefore, the Court grants HLMP a $3,000 credit.

G.        Offsets for Breach of Warranty

There is implied in every contract for work or services a duty to perform the work skillfully, carefully, diligently, and in a workmanlike manner.[84]

When the King Air was returned to Florida, it was inspected by personnel at CR Aviation, an FAA-certified repair station near Miami.  According to Evanega, HLMP's expert, this inspection was justified due to the lack of a completed checklist reflecting whether the King Air had in fact undergone a complete inspection as a part of the renovation process. CR Aviation charged $2,000 for that inspection.[85]   As previously discussed, the Court will credit the invoice $2,000 for that inspection.

Between problems revealed by that inspection and problems that became apparent during the first flight from Kansas to Florida, the King Air required additional work at CR Aviation, all as outlined on CR Aviation's invoice for corrective work.[86]  For example, although Lopez specifically requested in his original discrepancy list that the King Air's air conditioning be corrected, the air conditioning did not work on the flight from Kansas to Florida.  CR Aviation's owner, Miguel Rodriguez, testified that this was caused by a defective computer board and a broken terminal on a diode on the control switch.

Further, when DAI turned the King Air over to the Franklin County Sheriff, it did not deliver keys to the plane, thus preventing its door from being locked.  CR Aviation made keys for the plane. DAI never provided keys to HLMP.

---

[84] *Zenda Grain & Supply Co. v. Farmland Indus., Inc.*, 894 P.2d 881, 890 (Kan. Ct. App. 1995).

[85] Ex. 538.

[86] Ex. 538.

When Lopez brought the King Air to Mena, one of the plane's fuel cells was leaking. Lopez wanted all of the fuel cells inspected. DAI installed an overhauled fuel cell in the left hand outboard wing leading edge, according to the logbook entries signed by Bowers.[87]  CR Aviation later discovered leaking fuel cells.

CR Aviation also discovered problems with the engine calibration and rigging, a shorted wire to the King Air's beacon lights that had to be replaced, problems with the nitrogen level in the landing gear struts, a problem with the cabin urinary funnel, a missing FAA-required placard, improper hardware on the aileron, and a problem with the King Air's elevator (one of its flight controls).

Although the King Air's logbooks reflect that a battery was installed in the plane as a part of the renovation process,[88] that battery would not hold a charge, and had to be replaced once the King Air returned to Florida, according to the deposition testimony of Miguel Rodriguez.

HLMP paid CR Aviation the following amounts to resolve these problems, as reflected in Ex. 538 (the CR Aviation invoice):

| Issue | Payments |
| --- | --- |
| Inspection of Plane | $2,000.00 |
| Keys (Item 100 on CR Invoice) | $300.00 |
| Battery (Item 102) | $255.00 for installation, $3,542.95 for the replacement battery |
| Engine power issues (Item 103) | $1,275.00 |
| Re-rigging of engines to equalize power (Item 106) | $2,125.00 |

[87] Ex. 75.

[88] Ex. 75.

| | |
|---|---|
| Replace wire to beacon light (Item 107) | $340.00 |
| Repair air conditioning (Item 108) | $4,080.00 for labor, plus $1,755.00 for new PC Board |
| Fill landing gear struts with nitrogen (Item 111) | $382.50 |
| Repair cabin urinary funnel (Item 112) | $85.00 |
| Place missing placard (Item 113) | $85.00 |
| Replace aileron hardware (Item 114) | $255.00 |
| Repair/replace leaking fuel tanks | $1,785.00 for labor on one tank, $1,020.00 for labor on the other, plus $2.212.00 for one replacement tank, and $1,994.00 for the other |
| Re-rigging of elevator | $510.00 |
| Other parts needed (Control Cable Boot, Screws, Gasket, Relief Tube, and Freight) | $26.75, $2.40, $17.84, $241.00 and $254.44, respectively |
| **Subtotal** | $24,543.88 |
| **Sales Tax @ 6.86%8** | $1,683.71 |
| **TOTALS** | $26,227.59 |

Evanega testified that a plane that had undergone such extensive renovations should not have been experiencing problems of this nature so soon, and that HLMP was entitled to a credit for the cost of the corrective work. DAI offered no expert testimony to the contrary, claiming only that HLMP should have brought the plane back to DAI for warranty service, which the Court rejects.

The Court finds Plaintiff breached its duty to perform the work skillfully, carefully, diligently, and in a workmanlike manner for those items described above, and provides a credit of $26,227.59.

### H.       Summary

The Court finds the reasonable value of all work performed on the King Air, including the value of the parts, to be $532,792.23.  After allowing credits for advance payments and offsets for breaches of warranty, the Court awards $375,462.18.   This is summarized as follows:

**Amounts per DAI invoice**[89]

| Category | Amount Claimed by DAI | Amount Credited to HLMP | Total |
|---|---|---|---|
| DIPI parts | $100,752.29 | 0 | $100,752.29 |
| Items paid direct to vendors | $45,921.46 | $19,604.58 for hot section inspection and $1,250 for duplicate engineering approvals | $25,066.88 |
| Mena parts and other out of pocket expenses by Mena | $75,542.16 | $3,000 for starter generator and $500.15 for duplicate altimeter charges | $72,042.01 |
| DAI Parts | $58,656.05 | $16,100 for Garmin 530/TAWS unit | $42,556.05 |
| Mena Labor | $153,700 | -- | $153,700 |
| DAI Labor | $181,425 | $42,750 for undocumented hours | $138,675 |
| Total | $615,996.96 | $83,204.73 | $532,792.23 |

---

[89] Ex. 1.

**Offsets**

| Category | Amount Claimed by HLMP | Amount Credited to HLMP |
|---|---|---|
| Breach of Warranty | $26,227.59 | $26,227.59 |
| Payment Credits | $131,102.46 | $131,102.46 |
| Total | | $157,330.05 |

**Total**

$532,792.23 - $157,330.05 = $375,462.18.

## III.   CONCLUSIONS OF LAW

As stipulated by the parties, "The lien has been properly filed and its validity is not contested, though the amount of plaintiff's lien is contested."[90]  Accordingly, the Court concludes DAI properly recorded its mechanic's lien over the King Air, its engines, and propellers.

K.S.A. 58-201 establishes the right of a person who performed work, made repairs or improvements to personal property to obtain a lien for his or her work.  The statutes provides, in relevant part:

> Whenever any person, at or with the owner's request or consent shall perform work, make repairs or improvements or replace, add or install equipment on any goods, personal property, chattels, horses, mules, wagons, buggies, automobiles, trucks, trailers, locomotives, railroad rolling stock, barges, aircraft, equipment of all kinds, including but not limited to construction equipment, vehicles of all kinds, and farm implements of whatsoever kind, a first and prior lien on such personal property is hereby created in favor of such person performing such work, making such repairs or improvements or replacing, adding or installing such equipment and such lien shall amount to the full amount and reasonable value of the services performed and shall include the reasonable value of all material used

---

[90] Pretrial Order at 2, ECF No. 125.

in the performance of such services and the reasonable value of all
equipment replaced, added or installed.

Because a mechanic's liens is statutory, it can only be acquired in the manner and on the
conditions prescribed in the statute.[91]  "Those claiming a mechanic's lien have the burden of
bringing themselves clearly within the provisions of the statute."[92] "Lien statutes cannot be extended
by implication beyond the clear import of the language employed and their operation cannot be
enlarged to include activities not specifically embraced."[93]  Although courts give liberal construction
to statutory provisions once a mechanic's lien has attached, lien statutes must be strictly construed
when deciding whether a lien attaches.[94]

K.S.A. 58-201 allows a lien to be asserted by any person who, "at or with the owner's
consent or request" performs work on personal property.  The statute creates a first lien "in favor
of such person performing such work."  HLMP contends the implication of this statute is that one
who enters into a contract with an owner has a lien only for the work done pursuant to its own
contract with the owner, and may not assert the rights of others who have entered into separate
contracts with the owner.  DAI does not dispute HLMP's interpretation of the statute, and the clear
language of K.S.A. 58-201 supports HLMP's interpretation.  HLMP's interpretation also appears

---

[91] *Sec. Benefit Life Ins. Co. v. Fleming Cos.*, 908 P.2d 1315, 1320 (Kan. Ct. App. 1995)
(citing *Mark Twain Kansas City Bank v. Kroh Bros. Dev. Co.*, 798 P.2d 511, 515 (Kan. Ct. App.
1990)).

[92] *Id.* (internal quotations omitted).

[93] *Id.* (internal quotations omitted).

[94] *Mark Twain Kansas City Bank*, 798 P.2d at 515.

consistent with how courts in Kansas have interpreted the statute governing liens on real property.[95]

Accordingly, the Court concludes DAI may not subsume within its lien the contributions of others

unless they were legally DAI's subcontractors.

The Court has not found any authority defining a contractor or subcontractor in the context

of personal property liens pursuant to K.S.A. 58-201.  The Kansas Supreme Court, however, has

defined those terms in the context of real property liens.  Kansas courts apply the same general

principles in personal property lien cases as cases involving mechanics' liens placed on real

property.[96]   Accordingly, the Court holds that the Kansas Supreme Court's definitions of

"contractor" and "subcontractor" will apply in this case.  For the reasons previously described, the

Court concludes Mena and DIPI were subcontractors of DAI.

A central dispute in this case was whether the discrepancy sheets prepared by Mena satisfied

FAA record-keeping regulations.  The FAA regulations require meticulous record keeping of work

performed on airplanes, and the Court recognizes the importance of having accurate maintenance

records.[97]   Pursuant to 14 C.F.R. § 43.9, mechanics working on aircraft must make a separate entry

in the plane's "maintenance record" containing (a) a description of the work performed, (b) the date

the work was completed, (c) the name of the person performing the work (unless it is the same

---

[95] *See Unit Sash & Sales Co. v. Early*, 232 P. 232, 232–233 (Kan. 1925) (holding that a lien must be filed for what was furnished under *each separate* contract); *Stewart v. Cunningham*, 548 P.2d 740, 743 (Kan. 1976) ("more than one contractor may be employed by one property owner to perform labor or furnish material for the same construction project").

[96] *See Sec. Benefit Life Ins. Co. v. Fleming Cos*., 908 P.2d 1315, 1319, 1320 (Kan. Ct. App. 1995).

[97] *See Administrator v. Brauchler*, NTSB Order No. EA-5594, SE-19120, 2011 WL 3730275, at *7 (Aug. 17, 2011) ("records related to maintenance work performed on an aircraft must be scrupulously accurate").

person making the entry in the record), and (d) if the work performed on the aircraft has been performed satisfactorily, the signature, certificate number, and kind of certificate held by the person approving the work.[98]

Although DAI tried to argue that "discrepancy sheets" comply with the FAA record keeping requirements, this argument finds no support in the law. On at least two occasions, the National Transportation Safety Board (the federal agency charged with overseeing the FAA) has suspended the FAA licenses of individuals who performed work that was not recorded in the plane's logbooks, rejecting the same arguments presented in this case by DAI.[99]   NTSB approves the use of a discrepancy sheet only if there is a logbook entry that makes a direct reference to the discrepancy sheet in question.[100]   Plaintiff cites no authority to the contrary.  The Court holds that the Mena discrepancy sheets are not properly considered part of the maintenance record pursuant to 14 C.F.R. § 43.9.  As a result, the Court concludes it is appropriate to offset the value of the repairs performed on the King Air by the costs incurred by HLMP for having the plane re-inspected, in having another Phase 1 through 4 inspection, and other work of CR Aviation, as outlined above.

Based on the above stated findings of fact and conclusions of law, Plaintiff is granted an *in rem* judgment foreclosing its mechanic's lien on the subject Beech King Air Model 200 aircraft, Serial Number BB-48 with an FAA tail number of N750HL in the amount of $375,462.18.

---

[98] The signature constitutes the approval for return to service only for the work performed.

[99] *Administrator v. Hampton*, NTSB Order No. EA-5189, SE-17143, 2005 WL 3131713, at *2 (Nov. 18, 2005); *Administrator v. Scott*, NTSB Order No. EA-4030, SE-12203, 1993 WL 500791, at *3 n.5 (Nov. 22, 1993).

[100] *Scott,* 1993 WL 500791, at *3 n.5; *Hampton*, 2005 WL 3131713, at *2.

**IT IS SO ORDERED**.

Dated this 30th day of September 2011, at Topeka, Kansas.

s/K. Gary Sebelius
K. Gary Sebelius
U.S. Magistrate Judge